## 17525

Hannah M. SINGLETON, Bettie S. Ford, Janie S. Washington, Harry Singleton, Gladys Jordan, Mary Lee Gamble, General Lee Gamble, Robert W. Gamble, Maceo Gamble, Janie R. Murphy and Ernest Murphy, Minors Under Twenty-One Years of Age, By Their Guardian Ad Litem Ernette Washington and Violet Gamble, Appellants, v. MULLINS LUMBER COMPANY, a Corporation, Lilly Dozier, Lizzie Barnes, Bessie Coleman, Louis Dorsey, Mary Roe, Representing such persons as may be the unknown heirs, next of kin, Administrators, Executors or Assigns of the Estate of W. M. McIntyre, Deceased, Respondents.

(108 S. E. (2d) 414)

*Elliott D. Turnage, Esq.,* of Darlington, *for Appellants,*

*Messrs. Woods & Woods,* of Marion, *for Respondent, Mullins Lumber Company.*

*S. Raymond Pridgen, Esq.,* of Mullins, *for Respondents, Lillie Dozier, James Dozier, Theodore Dozier and Gomille Dozier Gore,*

April 16, 1959.

LEGGE, Justice.

By this action, commenced in September, 1957, the heirs of a deceased mortgagor seek to set aside a decree of foreclosure rendered in 1909, and to have themselves declared owners of the mortgaged premises. The Judge of Probate of Marion County, to whom the cause was referred, filed his report dated May 19, 1958, recommending that the complaint be dismissed. Upon exceptions to that report, it was heard before the Honorable G. Badger Baker, Judge of the Twelfth Circuit; and from his decree of July 14, 1958, overruling the exceptions and dismissing the complaint, comes this appeal.

The property in question, a lot on Laurel Street in the town of Mullins, was conveyed to Boyd Singleton by Mary M. McIntyre by deed dated May 11, 1906, the consideration recited being $150. On May 13, 1906, as security for his note in the amount of $82.45 bearing the same date, Boyd Singleton mortgaged the said lot to Thomas E. Cooper.

In 1908 Boyd Singleton died intestate, leaving as his heirs his widow, Hannah, and his five children, namely: Kemper and Joe, children of a former marriage; and Charles, Mary and Bettie, his children by Hannah.

In 1909 Thomas E. Cooper instituted suit in the court of common pleas for Marion County against Boyd Singleton's heirs before mentioned, for foreclosure of his mortgage; and, the defendants having been adjudged in default, the cause was referred to the Master to compute the amount due on the mortgage debt, and with leave to report any special matter. By decree of the Honorable Robert Aldrich, Presiding Judge, dated March 22, 1909, the Master's report was confirmed and the mortgaged premises were ordered sold at public auction after due notice; and pursuant to that decree

they were sold by the Master on May 3, 1909, to W. M. McIntyre for $20, he being at that figure the highest bidder. The Master's report of sale was confirmed by order of the Honorable John S. Wilson, Presiding Judge, dated June 5, 1909.

The complaint in the instant case alleged that the foreclosure before mentioned was null and void because in it there had been: (1) no legal service of process upon the defendants; (2) no order appointing a guardian *ad litem* for minor defendants; (3) no order of reference as required by circuit court rule 51; (4) no appearance at reference by the guardian *ad litem;* (5) no testimony at reference as required by rule 51; (6) no report by the Master of his findings of fact and conclusions of law "as required by law"; and (7) no filing by the plaintiff of his affidavit or a certificate of the Clerk of Court that a notice of *lis pendens* had been filed as required by said rule.

The complaint alleged that as the result of the nullity of said foreclosure proceedings the mortgagor-mortgagee relationship continued after their termination, "but that the unknown heirs, administrators, executors and assigns of said Thomas E. Cooper (joined as defendants under the fictitious name of Mary Roe) and W. M. McIntyre (joined as defendants under the fictitious name of Henry Doe) have as constructive trustees been in possession and control of said lot since the date of said action and should be held to account for the rents and profits derived from same. That defendants Lilly Dozier, Lizzie Barnes, Louis Dorsey and Bessie Coleman and Mullins Lumber Company are each of them in possession of separate portions. But that the nature and extent of the claims of said defendants in and to the title and right to peaceable possession of said lot and said portions thereof are to the plaintiffs unknown." Prayer was for judgment decreeing that the foreclosure proceedings and the deed from the Master to W. M. McIntyre were void, and that the plaintiffs are the owners of said lot and entitled to possession of it.

Lilly Dozier and her children, James Dozier, Theodore Dozier and Gomille Dozier Gore, answered, alleging title in herself and them, as heirs of Lilly's husband, Span Dozier (deceased intestate in 1946) by virtue of a deed from Mary M. McIntyre to Span Dozier in 1906, another from the same grantor to Span and Lilly in 1911, and another from H. M. Felder to Span in 1912. They also pleaded a general denial and the ten-year, the twenty-year and the forty-year statutes of limitation. To this answer the plaintiffs replied, alleging that the lot conveyed to Span Dozier in 1906 is not involved in this action; that neither the lot referred to in the complaint nor any of the other lots referred to in the answer has ever been surveyed so as to determine true boundaries; that therefore the defendants' possession has not been open, notorious, exclusive or adverse to that of the plaintiffs; that during all of the period mentioned in the said answer the record title to the property described in the complaint was held "by parties who had obtained same by actual or constructive fraud" of which the plaintiffs knew nothing until a few days prior to commencement of the action; and that the equitable relief sought is not barred by the statutes of limitation.

Mullins Lumber Company answered, pleading a general denial, the statutes of limitation, and laches. To this the plaintiffs replied, alleging that W. M. McIntyre, who had bought the property in question at the foreclosure sale for a grossly inadequate price, conveyed a portion of it in October, 1909, to one A. M. Lewis for $350; that in 1914 Lewis conveyed said portion, for $1,250, to H. O. Schoolfield, founder of Mullins Lumber Company, with whom said company is in privity; that both Lewis and Schoolfield had actual and constructive notice of the defects in the foreclosure, and were therefore not bona fide purchasers; that at the time of the foreclosure and of the subsequent conveyances, Hannah Singleton was practically illiterate and "unable to understand the nature and extent of the frauds being perpetrated by the defendants upon her title to the property and that of her children"; that said fraud was discovered by them a few

weeks prior to this action; and that therefore the statutes of limitation do not bar the plaintiffs from the equitable relief which they seek.

The Defendants Barnes, Coleman, and Dorsey did not answer.

At the reference the plaintiffs introduced in evidence, in addition to the deed from Mary M. McIntyre to Boyd Singleton before mentioned, and the judgment roll in the foreclosure proceeding of 1909 (which included Boyd Singleton's mortgage to Thomas E. Cooper), the following deeds:

1. Mary McIntyre to Span Dozier, dated March 1, 1906.

2. Mary M. McIntyre to Span and Lilly Dozier, dated May 25, 1911.

3. Mary M. McIntyre to H. M. Felder, dated July 5, 1911.

4. H. M. Felder to Span Dozier, dated November 6, 1912.

5. W. M. McIntyre to A. M. Lewis, dated October 12, 1909.

6. A. M. Lewis to H. O. Schoolfield, dated December 12, 1914.

The plaintiffs offered as witnesses the following: their attorney, who testified as to his examination of the records in the office of the clerk of court and proffered in evidence the exhibits before mentioned; Cornelius Murray, a professional photographer, who in company with plaintiffs' attorney took some pictures, not in the record before us, and made certain measurements on Laurel Street; Hannah Singleton, the widow of Boyd Singleton; Minnie Singleton, the widow of Boyd Singleton's son Kemper; and Bettie Ford, a daughter of Boyd and Hannah. We shall review the testimony of the three witnesses last mentioned, bearing in mind that, as stated in the minutes of the reference, "prior to the commencement of the testimony it was agreed by counsel for the parties that all testimony presented would be taken, but the right of any party to object to any portion or portions of the testimony was reserved and such objection

may be made after the testimony is completed, and at or prior to the argument before the Judge of Probate."

Hannah Singleton, Boyd's widow, who gave her age as seventy-seven, testified as follows: She and Boyd had lived, up to the time of his death about the year 1908, in Mullins, but not on the mortgaged premises. At some time after his death she moved, and now lives, "in the country", about three miles from Mullins. She did not know of the existence of the mortgage until Mr. Tom Cooper served the summons in the foreclosure suit upon her in the Mullins post office; no paper was ever served upon her at her home. At that time neither Joe nor Kemper, Boyd's children by his previous marriage, was living with her; both of them were married; Joe and his wife and small children were living in Richmond, Virginia. Hannah's own children, Charles, Mary and Bettie, were small, and lived with her. Charles, who was born in 1902, died during World War I; he had never married. Mary died about 1954. After the foreclosure "paper" had been served upon her, she "asked Mr. Cooper would he take half of this money and run the other half until another year, and he told me, no, he wanted it all." Then she went to Mr. Schoolfield, for whom Boyd had worked as night watchman, and asked him "if he would give me enough money to take the paper up, and he told me no." The following is quoted from the record of her testimony on cross examination:

"Q. And you knew when those papers were served on you that you were about to lose the property? A. I knew that I was about to lose it, but I didn't have no money and I couldn't get it.

"Q. You tried two places and could not get it, and when you failed to get the money you knew it was gone, didn't you? From that time on, you knew someone else had the property, didn't you? A. Well, I guess so.

\* \* \*

"Q. And you knew from that time on that other people had the property? A. I knew they had it.

"Q. And until this suit was brought you didn't do anything about it, did you? A. No, sir.

"Q. And these others—these children and grandchildren of yours—they had information all of these years that somebody else had that property? A. I guess they seed it.

"Q. Did any of them, as far as you know, do anything about it until this suit was brought? A. No, sir.

\* &ast; &ast;

"Q. Hannah, did you know Span Dozier? A. Yes, sir, I knowed him.

"Q. You knew him for years, didn't you? A. Yes, sir.

"Q. Did you know Lilly Dozier, his widow? A. Yes, sir.

"Q. You know that they have been living on the property —or do you know where they now live? A. I do.

"Q. Do you know of your own knowledge that they have been living there for many, many years? A. Yes, sir.

"Q. Did your children know that? A. I guess they seed 'em there.

"Q. Did you ever at any time talk to Span Dozier in relation to the property where he lived? A. I sho have not.

"Q. How long would you say that Span and Lilly Dozier have lived on the present property where they now live? A. I will tell you the truth—I don't know. I don't know. It has been a long time but I could not tell you direct.

\* &ast; &ast;

"Q. Were you living on the property that these papers were served about? A. No, sir.

"Q. You were not living on it, but you and your husband had possession of it and claimed it? A. Yes, sir.

"Q. But after the papers were served on you, you all did not claim it any more? A. No, sir; I didn't claim it any more.

"Q. You knew that you lost the property? A. Yes, sir; that was my idea. I thought it was gone."

Minnie Singleton, the widow of Boyd's son Kemper, gave her age as about seventy-two and her place of residence as

Mullins. She testified that Kemper was in his twenties when his father died; and that she and Kemper, who had married "a good while" before Boyd's death, were living in Mullins, with their three children, at the time of Boyd's death. Their oldest child was then about six years of age. Nobody ever came to their home to serve any papers in connection with the lot in question, and, so far as she knows, no papers were served on Kemper. On cross examination she testified that she could not say just when Kemper had died, but that she believed he was living during World War I. Kemper's brother, Joe, who lived in Richmond, died some time after Kemper's death. As to the property in question she testified as follows:

"Q. Do you know anything at all about this property we are talking about today? A. I knew it was around there.

"Q. Did you know that Boyd Singleton owned it? A. I knew he tended it, but I didn't know who owned it.

"Q. You know that after his death these other people went into possession of it, don't you? A. Yes, sir.

"Q. And you have known that and have seen them in possession ever since? A. Yes, sir."

Bettie Ford, aged fifty-one and who had resided in Mullins until about twenty years ago, when she moved to North Carolina, testified that she knew nothing of the foreclosure until about a year before the hearing. The following is quoted from her testimony on cross examination:

"Q. Do you know who was in possession of the property we are talking about when you left Mullins? A. Lilly Dozier and the Schoolfields have been in possession of it ever since I can remember, and I thought it was theirs."

The judgment roll of the foreclosure proceeding, as introduced in evidence by appellants (the action was entitled "Thomas E. Cooper, Plaintiff, again Kemper Singleton, Joe Singleton, Bettie Singleton, Charles Singleton, Mary Singleton and Hannah Singleton, Defendants") contained the following:

1. The summons, in usual form, referring to the complaint as filed in the Clerk's office.

2. The complaint, in usual form, for foreclosure of the mortgage in question.

3. A notice of pendency of action, in usual form. (Counsel for the personal respondents states in his brief that the judgment roll shows that this notice was filed on January 4, 1909, but the printed transcript before us does not disclose the date of its filing.)

4. A notice addressed to the defendants Charles Singleton, Mary Singleton and Bettie Singleton, infants under the age of fourteen years, and to the defendant Hannah Singleton as the person with whom they resided, to the effect that unless within twenty days from the service of said notice and of the summons in the cause, exclusive of the day of service, they should apply for the appointment of a guardian *ad litem* for said infant defendants, the plaintiff would apply to have D. F. Miles, or some other suitable person, appointed as such guardian.

5. Affidavit of James Norton, Jr., "not a part to the action", that he served the notice before mentioned upon Hannah Singleton personally and left a copy of it with her at her residence on January 27, 1909.

6. Affidavit of James Norton, Jr., that on January 27, 1909, he served the summons in the action upon the defendants Kemper Singleton, Joe Singleton, Charles Singleton, Mary Singleton, Bettie Singleton and Hannah Singleton, by delivering to them personally and leaving with them copies of the same "at their *residents* in Mullins, S. C."

7. Answer of the infant defendants by their guardian *ad litem*.

8. Affidavit of plaintiff's counsel, dated March 22, 1909, that no answer, demurrer or notice of appearance, except the formal answer of the infant defendants, had been received.

9. Order of Judge Aldrich, reciting that he had heard proof of service of the summons, and had heard the affidavit

of default, and referring the cause to the Master to compute the amount due, and with leave to report any special matter.

10. Master's report.

11. Decree of Judge Aldrich, dated March 22, 1909, confirming the Master's report, recited as having been filed that day, and ordering foreclosure and sale.

12. Master's report of sale, showing sale on May 3, 1909, to W. M. McIntyre for $20, he being at that price the highest bidder.

13. Order of Judge Wilson, dated June 5, 1909, confirming the Master's report of the sale.

A judgment regular upon its face is immune from ■ attack in any action other than that in which it was rendered, except upon proof of fraud or want of jurisdiction. *Ruff v. Elkin,* 40 S. C. 69, 18 S. E. 220; *First Carolinas Joint Stock Land Bank v. Knotts,* 191 S. C. 384, 1 S. E. (2d) 797; *Fouche v. Royal Indemnity Co. of New York,* 217 S. C. 147, 60 S. E. (2d) 73. Here appellants have invoked both of these grounds; but in our opinion their attack has fallen short of its objective.

Due proof of service appears in the record of the fore- ■■ closure proceeding. Such a record, standing as it has for approximately half a century, may not be overthrown by less than the clearest and most convincing evidence. To hold otherwise would be a dangerous thing, imperiling titles to real estate and other rights long since adjudicated; it would, moreover, be contrary to precedent unbroken in the history of our jurisprudence. Even though proof of service were wholly lacking, it would be presumed that the court that rendered the judgment would not have done so without proper proof of service of the summons in the cause. *Clark v. Neves,* 76 S. C. 484, 57 S. E. 614, 12 A. L. R., N. S., 298; *Coogler v. Crosby,* 89 S. C. 508, 72 S. E. 149; *Abraham v. New York Underwriters Ins. Co.,* 187 S. C. 70, 196 S. E. 531. And such presumption grows

stronger with the passage of time. *Clyburn v. Reynolds,* 31 S. C. 91, 9 S. E. 973.

By what evidence do appellants here seek to prove that the affidavit of service in the foreclosure suit was false and that the defendants in that cause were not served with process therein? By the testimony of Hannah, of her daughter, Bettie, and of her daughter-in-law Minnie Singleton. That of the two last named was wholly negative, and fully warranted the conclusion of both of the lower tribunals that it was insufficient to overcome the presumption to which we have just referred. In this connection it will be noted that the time of the foreclosure suit Bettie was not over three years of age.

Hannah's testimony concerning service of the summons in the foreclosure suit was both positive and negative in character. With respect to her claim that service was made upon her by Mr. Cooper himself, the plaintiff in the suit, it was positive; as to her claim that no paper was ever served upon her at her home, it was negative. Respondents having objected to this testimony, the Probate Judge ruled it inadmissible under Section 26-402 of the Code and also upon the authority of *Fleming v. Chappell,* 118 S. C. 290, 110 S. E. 148, and further held that even if it were admissible it was insufficient, in his opinion, to refute the affidavit of service in the record, especially after the lapse of so many years. Judge Baker, in his decree now under review, sustained the ruling of the Probate Judge as to inadmissibility, and held also that even if the testimony had been admissible, it was "most inadequate to rebut the strong presumption arising from the affidavit of service." The issue of whether or not service of the summons in the foreclosure suit was made as stated in the affidavit of service was one of fact; evaluation of the credibility and sufficiency of Hannah's testimony with regard to that issue was primarily for the Probate Judge. There was before him, on the one hand, the testimony of an aged and by no means disinterested witness; on the other, the evidence of a fifty-year-old record of a court of general jurisdiction, containing an affidavit of

service, regular in all respects, by one not a party to the cause. His finding that Hannah's testimony was insufficient to overcome the strong presumption of legality arising from such a record was not without evidentiary support, nor was it, in our opinion, against the clear preponderance of the evidence. Concurrence in that finding by the Circuit Judge is conclusive upon this court. *Large v. Large,* 232 S. C. 70, 100 S. E. (2d) 825; *Wise v. Picow,* 232 S. C. 237, 101 S. E. (2d) 651. Review of the lower court's ruling as to the admissibility of Hannah's testimony, as distinguished from its credibility and sufficiency, is, therefore, not essential to our decision of this case; but we shall discuss it nevertheless.

Assuming that Thomas E. Cooper had died prior to the commencement of the present action (a fact apparently conceded by the appellants, who joined as defendants his "unknown heirs, administrators, executors or assigns"), the testimony of Hannah to the effect that he had personally served the summons upon her was clearly within the prohibition of Section 26-402, *Harris v. Berry,* 231 S. C. 201, 98 S. E. (2d) 251.

Exclusion of her negative testimony was, we think, erroneous. Discussion of this ruling requires consideration of what is meant by the term "direct", and what by the term "collateral", as used with reference to an attack upon a judgment. The diversity in judicial thinking on the subject is apparent from its treatment in 30A Am. Jur., Judgments, Paragraphs 851-862. See also the annotations in L. R. A. 1918D 470, and 140 A. L. R. 823. Webster's New International Dictionary (2d Ed., 1954) gives, as the primary definition of "collateral": "accompanying, as a side or secondary fact, or acting as a secondary agency; subsidiary; subordinate; indirect." A "collateral attack" upon a judgment must necessarily be collateral to something; and much of the divergence among the attempted definitions of the term arises because of varying viewpoints as to what the thing is to which the attack is collateral. Is it the action in which the judgment

under attack was rendered? Logically, it would appear not, for whether the attack be made by a proceeding within that cause or, as here, by a separate suit in equity, it can hardly be viewed as secondarily accompanying, or subsidiary or subordinate to that action. A more logical view seems to be that which bases the distinction between direct and collateral attack upon the relation of the attack to the purpose of the action or proceeding in which it is made. In this view, if the action or proceeding is brought for the very purpose of overthrowing the judgment, the attack is direct; if the attack is made in an action or proceeding that has an independent purpose other than the overthrow of the judgment, it is collateral. 30A Am. Jur., Judgments, Paragraph 852. This point of view is clearly voiced in *Hays v. Alway*, 1917, 30 S. D. 586, 166 N. W. 139, 141, where suit had been brought to set aside, for lack of proper service of the summons, a judgment rendered against the plaintiff (defendant in the former action), an execution sale thereunder, and certain deeds made by the purchaser at that sale and his grantees. Said the court: "There is no merit in appellant's contention that this is a collateral attack on a judgment. The action was brought for the purpose of having the judgment declared void. It is true he asked to have the execution sale and the subsequent conveyances set aside, but this relief was only incidental to the other. So long as the judgment remained intact the conveyances complained of were unassailable. The action constitutes a direct attack on the judgment."

Since every attack upon a judgment is either direct or indirect, the use of the word "indirect" rather than "collateral" would perhaps have obviated much of the confusion that has sprung from steadfast loyalty to the phrase "collateral attack" without due regard to its proper connotation. If the matter were one of phraseology only, there would be slight, if any, justification for the present discussion; but the not too careful use of the phrase just quoted has led to statements, in some of our earlier decisions, that bear upon the ruling in this case as to the competency of Hannah's "negative" testimony, and that seem to require clarification.

In *Southern Porcelain Manufacturing Co. v. Thew,* 5 S. C. 5, it was held that one claiming invalidity of a judgment rendered again him must do so "by a motion in the court in which the judgment was rendered, having for its direct object the vacation or modification of the judgment, and by appeal from the decision of the court on such motion", and that "the validity of the judgment cannot be called in question in any subsequent action at law." The court nevertheless expressly recognized the right of one against whom such judgment had been rendered to attack it in a separate suit on the equity side of the court for fraud in its procurement. To the same effect is *Darby v. Shannon,* 19 S. C. 526. And in *Turner v. Malone,* 24 S. C. 398, the court said:

"It seems that, in respect to impeachment, a judgment may be either 'void' where the record shows the fatal defect without proof, or 'voidable' where there is a hidden infirmity which can only be made to appear by proof * * *. In the case of a judgment merely 'voidable', where proof is necessary, it seems that the infirmity cannot be shown in a collateral manner, but only in a direct proceeding instituted for that purpose; and until that is done the judgment must be respected as such. As we understand it, what is meant by a direct proceeding is a proceeding by the party injured, claiming to have the judgment formally avoided by order in the court and in the case in which it was rendered. A collateral attack upon a judgment has been defined to be 'one in an action other than that in which it was rendered.' Rap. & Law. Dict., title 'Collateral Impeachment'."

In *Ruff v. Elkin, supra* [40 S. E. 69, 18 S. E. 223], it was said that the legal presumption in favor of the validity of a judgment is "so conclusive in its character as to give the judgment immunity from impeachment in any collateral proceeding, that is to say, 'In an action other than that in which it was rendered, except upon proof of fraud, or want of jurisdiction.' See 1 R. & L. Dict. 'Collateral Impeachment', page 226; *Riker v. Vaughan,* 23 S. C. 187; *Turner v. Malone,* 24 S. C. 398; *Tederall v. Bouknight,* 25 S. C. 276."

In *New York Life Ins. Co. v. Mobley,* 90 S. C. 552, 73 S. E. 1032, 1035, it was again said that any proceeding to avoid a judgment for a jurisdictional defect not apparent upon inspection of the record, other than a motion in the cause in which the judgment was rendered, must be regarded as a collateral attack. But the court went on to say "that an action on the equity side of the court to set aside a judgment on the ground that it was a nullity, by reason of the fact that the summons was not served upon the defendant therein, cannot be maintained, unless the complaint alleges some other fact entitling the plaintiff to equitable relief."

In *Scott v. Newell,* 146 S. C. 385, 144 S. E. 82, 89, the court declared: "There are three ways of attacking a judgment: (a) Collaterally; (b) directly; (c) action on the equity side of the court." This statement is immediately followed by another, quoted from *New York Life Ins. Co. v. Mobley, supra,* to the effect that "any proceeding to have the judgment declared a nullity, other than a motion in the cause in which the judgment was rendered, must be regarded as a collateral attack."

It will be observed that in *Scott v. Newell, supra,* as well as in the earlier cases that we have mentioned, the independent suit in equity is recognized as a proper method of attacking a judgment and is nowhere expressly denied the status of a direct attack, although it is indirectly characterized as collateral despite the fact that its sole purpose may be the overthrow of the judgment. Such indirect characterization has persisted through *First Carolinas Joint Stock Land Bank v. Knotts, supra,* and *Fouche v. Royal Indemnity Co. of New York, supra,* the opinion in the *Knotts case* nevertheless emphasizing the exception, where fraud or collusion is alleged, to the general rule "that a judgment may be attacked collaterally only when its defects and infirmities are apparent by an inspection of it." [191 S. C. 384, 1 S. E. (2d) 805.]

If the language used in numerous decisions, to some of which we have referred, expressing the view of our court

with regard to attack upon a judgment, be taken literally, the following paradox is apparent:

(a) The only direct attack is by motion or other proceeding in the cause in which the judgment was rendered;

(b) Every other attempt to overthrow a judgment is a collateral attack;

(c) Collateral attack will lie only where the defect or infirmity is apparent on the face of the record of the judgment;

(d) Direct attack will lie not only for defect or infirmity apparent upon the record of the judgment, but also for a hidden defect or infirmity for proof of which resort must be had to evidence dehors such record;

(e) The judgment may also be attacked, for defect or infirmity not apparent upon its record, by a separate, independent suit in equity.

But the obvious inconsistency of (e) with (a), (b) and (c) disappears if the term "collateral attack", as used with reference to a separate action, be construed as meaning attack *at law*. And such construction is, we think, reasonably warranted; for although since our adoption of code procedure in 1870 legal and equitable causes of action have no longer been entertained by separate courts, they have generally continued, as before, to be designated respectively as "actions at law" and "suits in equity". Cf. 1 Am. Jur., Actions, Section 49; 41 Am. Jur., Pleading, Section 6. It seems not unreasonable, then to assume that the "action" referred to by Rapalje and Lawrence in their dictionary (1883) and by our court in *Ruff v. Elkin* and the earlier cases before mentioned was an "action at law". See also *Southern Porcelain Manufacturing Co. v. Thew,* 1873, *supra,* where, as before noted, it was said that the validity of a judgment cannot be called into question in any subsequent "action at law". In this view, the separate suit in equity is not to be regarded as a "collateral attack"; but it must be remembered that such a suit can be maintained only upon

grounds entitling the plaintiff to equitable, as distinguished from legal, relief. For example, allegation that the judgment is void because the summons had in fact never been served upon the defendant is not in itself sufficient to support the suit; the complaint must allege some other facts, entitling the plaintiff to equitable relief. *New York Life Ins. Co. v. Mobley, supra.* Another limitation that appears quite sound is that such a suit must have for its very purpose the impeachment or overthrow of the judgment; its attack upon the judgment may not be presented as an issue incidental to some other, independent, purpose. 30A Am. Jur., Judgments, Par. 852.

*Fleming v. Chappell, supra,* was an action for forcible entry and detainer and also for statutory treble damages. In it the plaintiff attacked a judicial sale under decree in partition, upon the ground that he, a non-resident defendant in the partition suit, had never been served with the summons. His testimony to that effect was excluded, upon the ground that the action was an attempted collateral attack upon the record in the partition suit, and therefore could not be maintained. And so, indeed, it was, for two reasons: (1) because it was at law, not in equity; and (2) because it had an independent purpose other than the overthrow of the judgment, to wit: the recovery of treble damages under the statute.

The instant case is quite different. It was brought in equity and founded upon charges of constructive fraud giving rise to an alleged trust; and its prime objective was the overthrow of the judgment. Had that objective been achieved, the setting aside of the foreclosure sale would have followed as incident to that relief. In our opinion this was a direct attack, not a collateral one or, in the picturesque language of Chancellor James in *Coit v. Owen,* 2 Desaus. 456, 2 S. C. Eq. 456, an attempt to overturn a decree "by a side wind". But whether it be denominated direct or collateral, it was a mode of attack recognized in this jurisdiction as proper, and therefore the cause

was entitled to hearing on its merits. This being so, it follows that Hannah's "negative" testimony, albeit insufficient, in the opinion of both the lower tribunals, to overcome the strong presumption in favor of the judgment, was nonetheless competent, for it concerned a matter that was presumably within her personal knowledge.

However strong might have been appellants' evidence tending to impeach the affidavit of service, their cause could not stand upon that alone. As has been pointed out, it is essential, in an action of this kind, that facts be alleged (and of course proven) entitling the plaintiff to *equitable* relief. In the case at bar, appellants assert that their right to such relief is based upon constructive fraud in the procurement of the decree of foreclosure and in the sale by the Master pursuant to that decree. The sufficiency of the rather general allegations of their pleadings to charge constructive fraud may well be doubted; but the point does not appear to have been raised by respondents' pleading, and the trial proceeded upon the assumption that this equitable essential of the plaintiffs' cause of action had been sufficiently alleged.

To establish constructive fraud, proof of actual intent to deceive is not required; the absence of such intent distinguishes constructive from actual fraud. *Greene v. Brown*, 199 S. C. 218, 19 S. E. (2d) 114. But the burden of proving fraud, actual or constructive, is a heavy one; the proof must be by evidence that is clear, cogent and convincing. *Griggs v. Griggs*, 199 S. C. 295, 19 S. E. (2d) 477.

In *All v. Prillaman*, 200 S. C. 279, 20 S. E. (2d) 741, 750, 159 A. L. R. 981, this court approved the following, from 65 C. J. 493, 494, as the measure of proof required to establish a constructive trust *ex maleficio*:

"It has frequently been laid down as an established rule that a mere preponderance of the evidence is not sufficient to prove a constructive trust, but that it must be established

by evidence which is clear, definite, unequivocal, and satisfactory, or such, as has been said, as to lead to but one conclusion, or as to leave no reasonable doubt as to the existence of the trust   *   *   *. Positive and uncontradicted testimony of the existence of facts sufficient to give rise to a constructive trust need not necessarily be adopted as true by the trial Judge, if he is not convinced thereby; and testimony given long after the transaction in question, and after the parties concerned are dead, although positive and not contradicted by other testimony, is to be regarded with serious misgivings."

To the same effect is 89 C. J. S. Trusts § 158.

Careful examination of all of the evidence on the part of the plaintiffs leaves us in full agreement with the Probate Judge and the Circuit Judge that it falls far short of meeting the test to which we have just referred. Appellants point to nothing in the record of the foreclosure that suggests constructive fraud in the procurement of the decree; in short, their argument boils down to the contention that fraud may be inferred from the meager price that the lot brought at the foreclosure sale.

It is of course well settled that inadequacy of price, unless so gross as to shock the conscience of the court or accompanied by circumstances from which fraud may be clearly inferred, will not justify the overthrow of a judicial sale. *Brownlee v. Miller,* 208 S. C. 252, 37 S. E. (2d) 658; Appeal of Paslay, 230 S. C. 55, 94 S. E. (2d) 57; *Spillers v. Clay,* 233 S. C. 99, 103 S. E. (2d) 759. The evidence suggests no such circumstances accompanying the foreclosure sale here involved. Nor was the price so grossly inadequate as to shock the conscience of the court in the foreclosure suit or that of any of the three tribunals before whom the instant case has been argued. Except for such inference as may be warranted by the consideration of $150.00 recited in the conveyance by Mary M. McIntyre to Boyd Singleton in 1906 and the amount of the debt, $82.45,

secured by Singleton's mortgage to Cooper two days later, there is no evidence whatever as to the actual value of the lot at the time of the foreclosure sale in 1909, other than that of Lilly Dozier, which was uncontradicted and to the effect that the lot was a vacant one, covered with broom straw and huckleberry bushes.

Appellant's exceptions have all been given full consideration. We need not discuss those that relate to the lower court's rulings with regard to statutory limitations, laches, identification of the property involved, and other matters beyond the issues hereinbefore determined; for the case is disposed of by what we have already said. Being convinced, as were the Probate Judge and the Circuit Judge, that the evidence on the part of the appellants was insufficient to overthrow the decree of foreclosure and the Master's sale thereunder, we affirm on that ground the judgment appealed from.

Affirmed.

STUKES, C. J., and TAYLOR, OXNER and Moss, JJ., concur.