## 17830

W. C. WATSON, As Administrator *Cum Testamento Annexo* of the Estate of S. J. Wall, and the Attorney General of the State of South Carolina, Respondents, v. Sadie L. Wall, Individually and as Executrix of the Will of W. Furman Wall, Appellant.

(121 S. E. (2d) 427)

*Messrs. James B. Dixon* and *Woods & Woods,* of Marion, *for Appellant,*

*Messrs. J. Malcolm McLendon* and *Norton & Norton,* of Marion, *for Respondents,*

August 31, 1961.

LEGGE, Justice.

Plaintiff, as administrator c. t. a. of the estate of S. J. Wall, instituted this action in September, 1956, for partition of a tract of two hundred fifty acres, consisting principally of timber land in Marion County, that had been owned by S. J. Wall's mother, Sarah J. Richardson Wall, at the time of her death in 1932, and title to which had thereupon vested in her six surviving children. The complaint alleged that subsequent to his mother's death one of said children, W. Furman Wall, had conveyed his interest in the property to his brother, the said S. J. Wall.

Sadie L. Wall, individually and as executrix of the will of W. Furman Wall, was permitted to intervene as a party defendant. By her answer she alleged that at the time of his conveyance to S. J. Wall, on April 5, 1939, W. Furman Wall was mentally incompetent, and that said deed had been obtained from him by fraud, duress, and undue influence, and for the grossly inadequate consideration of $600-.00 and she prayed that it be set aside upon her payment to the estate of S. J. Wall of said sum, plus interest, or be declared an equitable mortgage and cancelled upon such payment. She appeals from an adverse decree.

By consent of the parties, the timber on the tract of land in question was sold on November 4, 1957, for $133,-239.30 and by like consent the land was sold on February 3, 1958, for $23,150.00. The net proceeds of both sales have been distributed among the parties according to their respective interests, except that $24,149.60, representing the proceeds of sale of the one-sixth interest conveyed by the deed under attack is being held by the Judge of Probate for Marion County pending determination of this action.

Testimony before the Special Referee as to the value of the whole tract in 1939 ranged from $4,000.00 to to $40,000.00. Its valuation as agreed upon between

S. J. Wall and W. Furman Wall for the purpose of the conveyance by the latter of his one-sixth interest in April of that year was $3,600.00. Without attempting precisely to fix the actual value of the grantor's one-sixth interest at the time of his conveyance of it, the Special Referee found that it was more than the $600.00 that S. J. Wall had paid for it, but not so greatly in excess of that amount as to shock the judicial conscience. That finding, in which the Circuit Judge concurred, was amply supported by evidence of the very low market values in 1939 of land and timber as compared with the high prices prevailing in 1957 and 1958, and by evidence of the growth of timber during the interval of nearly twenty years between those dates. Also pertinent to the finding was the fact that W. Furman Wall's interest was an undivided fractional one.

The Special Referee, adverting to the conflict in the evidence as to W. Furman Wall's mental and physical condition at the time of his execution of the deed, concluded that he did not at that time have sufficient mental capacity to fully evaluate the property and his interest therein; and that his brother S. J. Wall, a man of superior ability, had taken undue advantage of him in the transaction, particularly by stating to him, in a letter some two months prior to the date of the execution of the deed, that "it will cost more than your interest is worth to divide it in the courts." He accordingly recommended that the deed be set aside upon payment to the administrator c. t. a. of the estate of S. J. Wall of the sum of $600.00, with interest from April 21, 1939, which was the date upon which the consideration for the deed of April 5, 1939, had been paid. We note here that tender of this amount prior to the intervention had been waived, it being agreed that such tender if made it would have been rejected.

The Honorable G. Badger Baker, Judge of the Twelfth Judicial Circuit, before whom the cause then came on exceptions to the Special Referee's report, disagreed with the

conclusion therein reached, held that the evidence was insufficient to establish fraud or undue influence on the part of S. J. Wall, and dismissed the claim of the intervening defendant.

The issues under the intervention being equitable, the lower court's factual findings are subject to review on appeal and may be reversed if in our opinion they are contrary to the preponderance of the evidence, *Simonds v. Simonds,* 232 S. C. 185, 101 S. E. (2d) 494. The burden of convincing the appellate court of such error is of course upon the appellant. *Inabinet v. Inabinet,* 236 S. C. 52, 113 S. E. (2d) 66. In approaching consideration of these findings, we bear in mind that fraud is never presumed, *Smith v. Traxler,* 228 S. C. 418, 90 S. E. (2d) 482; and that the intervening defendant, having asserted fraud as the ground for the relief sought, assumed the heavy burden of proving it by clear, cogent and convincing evidence. *Singleton v. Mullins Lumber Co.,* 234 S. C. 330, 108 S. E. (2d) 414; *Gary v. Jordan,* 236 S. C. 144, 113 S. E. (2d) 730.

W. Furman Wall, who lived in Spartanburg, had failed in business in 1927, and from then until his death in 1956 was in dire financial straits. After the loss of his business he had lost his home; he was never able thereafter to make a success in business; he took small jobs, such as timekeeper at a military installation and bailiff in the county court house; he became a prey to nervousness and worry; and he took to excessive drinking. In 1939 his only property appears to have been his undivided one-sixth interest in the two hundred fifty acre tract here involved, which had come to him upon his mother's death in 1932. His brother S. J. Wall was a capable and stable man of business, for many years Superintendent of Education for Marion County, where he resided, and later a member of the General Assembly, in which he was serving at the time of his death in 1951. It appears that he had been admitted to the bar of South Car-

olina, but did not actively engage in the practice of law. The provisions of his will, dated November 8, 1948, which were before this court for construction in *Watson v. Wall*, 229 S. C. 500, 93 S. E. (2d) 918, reveal him as a man of considerable property.

Testimony as to W. Furman Wall's mental capacity at the time of the execution of his deed in April, 1939, was conflicting. There was evidence that on September 30, 1939, he was committed by the Probate Judge to the State Hospital as a person of unsound mind; but the information upon which the medical examination preliminary to the commitment was based suggests excessive use of alcohol as the cause of the mental disturbance, and the only conduct certified by the examining physicians as having been observed by them was that the patient was "very excited and at times very depressed" and "admits mental condition is not clear"; and on November 18, 1939, the Superintendent of the State Hospital reported to the Probate Judge that after careful study by the medical staff of the hospital Mr. Wall had been found not insane and had been discharged on November 15, 1939. Mr. Thomas M. Lyles, a highly respected member of the Spartanburg bar, testified that he had known Mr. Wall and his family since 1915, and that in his opinion Mr. Wall was not competent to handle any business transaction after he lost his business in 1927. On the issue of mental capacity there were many other witnesses, pro and con. Extensive review of their testimony would be impracticable and, we think, unnecessary, for in our view, as in that of the Circuit Judge, the most convincing evidence is to be found in the correspondence between the two brothers extending over a period of eighteen months immediately preceding the conveyance by W. Furman Wall to S. J. Wall.

On October 10, 1937, W. Furman Wall wrote to his brother, saying that he was "strictly up against it", having no money and being unable to borrow any, and urging that

the property be sold so that he could get his part and "go ahead again." To this letter S. J. Wall replied on November 15, 1937, saying that so far as he was concerned he would be glad for W. Furman Wall to sell it, but urging him for his own sake not to do so, but to "try to keep something to support you when you are helpless and not run through with everything you have and depend on others to support you  *  *  *."

Again, on November 23, 1937, W. Furman Wall wrote to S. J. Wall, saying that he was in distress; that he was going to sell his interest in the timber at all events; that he had a prospective purchaser, but would prefer to sell to S. J. Wall if he was interested; and that he was coming to Marion about Christmas time and hoped that a satisfactory settlement could be had.

Again on December 3, 1937, he wrote, saying that he had been advised by attorneys that the interest of B. (an incompetent brother) could be taken care of by the appointment of a committee; and that he (Furman) wanted to confer with S. J. as soon as possible and hoped that the latter would be in position to buy his interest in the timber.

Again, on December 19, saying that as soon as possible he would come to Marion and confer with S. J. Wall; and that he would not like to employ a lawyer until he should hear from S. J. Wall.

Again, on February 27, 1938, saying that he was having a new guardian appointed for B.; that he had spoken to a lawyer in Spartanburg, but was uncertain whether to employ him or to get one in Marion; again urging settlement; and saying that he would try to confer with S. J. Wall in Marion.

Again, on December 11, 1938, he wrote to S. J. Wall, saying that he was planning to come to Marion at Christmas; that a conference between them was imperative before he (Furman) should take any steps; that he was in dis-

tress; that if he had a little money he could start a small business; and if the rest of the family did not want to sell he would like to sell his interest.

Again, on January 15, 1939, W. Furman Wall wrote to his brother. It is apparent from this letter that W. Furman Wall had recently been to Marion; that S. J. Wall had advised him not to sell; that W. Furman Wall still insisted upon selling, also saying that he had an opportunity to go into a small business, that he would rather sell his interest in the property to S. J. Wall than to another, and that "we have gone over the timber carefully and the place, and we decided it is worth $3,000.00 or $4,000.00". He enclosed a certificate of a Spartanburg lawyer to the effect that examination of the public records revealed no unsatisfied judgments against W. Furman Wall, and that, so far as those records were concerned, W. Furman Wall could convey marketable title.

Under date February 4, 1939, S. J. Wall replied as follows:

"Marion, S. C.
February 4, 1939

"Mr. F. W. Wall
Spartanburg, S. C.

Dear Furman:

"I received your letter and the statement from Mr. Walter B. Miller, attorney, as to you making a title to real property. Mr. Miller's statement is so restricted that no one would accept it without further proof that you are capable of making a title to real estate. He only stated as far as the records were concerned. He did not say anything about your physical condition. At your age and your health as bad as it is you have no business of going into business. Your best plan is to get work where you can and apply for an old age pension when you become sixty-five years old. If you try to go into business it will debar you from getting this pension. I really believe if you could see yourself you would not

attempt such as the old negroes down home saw what a condition you are in. Some of them said you needed someone to look after you. You do not see your condition as others see you. You imagine a lot of things you can do that you cannot. If you were to get your part of the old plantation and run through with it, you would be then like Bishop, cast upon the public to take care of you. If you were to become paralyzed you would have something to live on a while if you did not sell it.

"If you had listened to me, you would have had your home now. When you came down here to try to borrow $2,-000.00 from me to go back in business and I told you I did not have it, you asked me what I thought about you putting a mortgage on your home to go back in business after you had gone broke before. I told you you would be crazy to do it. You did not take my advice and you see where you are.

"I spoke to three men about buying your interest in the old plantation. Neither of them will buy it unless they can get the entire place or it is divided up as they want to cut the timber off it at once. It will cost more than your interest is worth to divide it in the courts.

"You say you and the rest of the heirs have estimated the place to be worth $3,000.00 or $4,000.00. If you still persist in selling your interest if you will get a statement from some reputable doctor that you are physically and mentally able to make a title to real estate, I will try and borrow the money and give you $600.00 for your part of the plantation. This will be valuing it at $3,600.00.

"Let me know what you decide to do. I am

Very truly,

S. J. Wall"

On February 15, 1939, W. Furman Wall wrote to S. J. Wall, enclosing a statement from Dr. W. S. Zimmerman certifying that he was mentally and physically capable of executing any legal papers.

On March 11, 1939, S. J. Wall wrote to W. Furman Wall, telling him that if he would accept $600.00 for his interest, he could have his lawyer prepare a deed and send it, either to S. J. Wall or to the bank in Marion, and that if the deed was in proper form S. J. Wall would send his check for the purchase price. This letter contained no statement tending to persuade W. F. Wall to complete the sale, but rather admonished him against it, pointing out that it would extinguish any claim that he might have to the property, and indicating that if he should dissipate the proceeds he need not look to S. J. Wall for help.

After further correspondence, S. J. Wall finally, at his brother's request, had a deed prepared and forwarded it to him; and he executed it in the presence of the Clerk of Court and the Deputy Clerk of Spartanburg County, on April 5, 1939. On April 12, 1939, his wife, who is the intervenor in the present action, duly renounced her dower before the Deputy Clerk as notary public.

It is evident that W. Furman Wall, though legally sane, was of subnormal mentality and certainly not the equal of his brother in a business transaction. But we fully agree with the Circuit Judge that the evidence here shows that W. F. Wall fully understood and comprehended the transaction, and does not preponderantly show that his brother defrauded him or took undue advantage of him in the purchase of his interest in the tract in question.

The Special Referee characterized the statement in S. J. Wall's letter of February 4, 1939, that "it will cost more than your interest is worth to divide it in the courts", as incorrect, legally and factually, and calculated to mislead W. F. Wall and in his weak mental condition unduly to influence him to sell his interest at a low figure. We agree with the Circuit Judge that the quoted statement, taken alone, appears ambiguous, but that in context with the remainder of that letter and with the entire correspondence between the brothers it does not warrant the inference of a calculated

fraudulent design. It is to be noted, also, that prior to this letter W. Furman Wall had written to his brother, on January 15, 1939, advising that he and the others had valued the property between $3,000.00 and $4,000.00.

Appellant charges that the Circuit Judge erred in considering the written statement of Dr. Zimmerman that had been enclosed in W. F. Wall's letter of February 15, 1939, before mentioned. At the hearing before the Special Referee (which was under a general order of reference) this statement was introduced under the testimony of Dr. Zimmerman's niece, who testified that he had died many years ago, and who identified as his the signature on the statement. It was objected to on the single ground that Dr. Zimmerman was not available for cross examination. The Special Referee held it admissible; no exception to that ruling was taken, and the record does not show that the issue of its admissibility was passed upon by the Circuit Judge. But apart from the question of appellant's standing to raise the issue here, as to which see *Lisenby v. Newsom,* 234 S. C. 237, 107 S. E. (2d) 449, we think that there was no error in admitting the statement. Its authenticity was not impeached; there was no question as to its having been sent by W. Furman Wall and received by S. J. Wall as preliminary to the consummation of the transaction between them. The real issue was not the correctness of Dr. Zimmerman's statement (as to which he might have been cross examined if present), but whether or not S. J. Wall's conduct in the transaction with his brother was fraudulent. The fact of his receipt of the statement was competent evidence bearing on that issue. We need not decide whether consideration by the Circuit Judge of the truth of the statement was improper. If it was, the error was not such as to require reversal, for in our opinion the evidence, without that statement, conclusively showed that W. Furman Wall had sufficient mental capacity to understand the transaction.

Having concluded that the intervenor has failed to prove fraud or undue influence, we do not reach the issue of laches.

Affirmed.

TAYLOR, C. J., and OXNER, MOSS and LEWIS, JJ., concur.