# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

Winrose Homeowners' Association, Inc. and Regime Solutions LLC, Respondents,

v.

Devery A. Hale and Tina T. Hale, Petitioners.

Appellate Case No. 2018-001238

---

## ON WRIT OF CERTIORARI TO THE COURT OF APPEALS

---

Appeal From Richland County
Joseph M. Strickland, Master-in-Equity

---

Opinion No. 27934
Heard September 24, 2019 – Filed December 18, 2019

---

## REVERSED AND REMANDED

---

Kathleen C. Barnes, of Barnes Law Firm, LLC, of Hampton; and Brian L. Boger, of Columbia, for Petitioners.

Eric C. Hale and Elias Fain, both of Clarkson & Hale, LLC, of Columbia, and Stephanie C. Trotter, of McCabe, Trotter & Beverly, PC, of Columbia, for Respondents.

---

**JUSTICE KITTREDGE:** Homeowners Devery and Tina Hale purchased their home (the Property) twenty-one years ago and have made timely mortgage

payments ever since, accruing over $60,000 in equity in the Property, which has a fair market value of $128,000. However, after failing to pay $250 in homeowners' association dues to Winrose Homeowners' Association, Inc. (the HOA), the HOA foreclosed on the Property, and a third-party purchaser, Regime Solutions, LLC (Regime), bought it for a pittance. The Hales now challenge the judicial sale, arguing the winning bid price of approximately $3,000 was grossly inadequate compared to the value of the Property.

There are two methods used to determine whether a winning bid at a foreclosure is grossly inadequate. One method assumes the foreclosure purchaser will become responsible for the mortgage on the property and thus adds the value of the outstanding mortgage to the winning bid, whereas the other method does not. While we do not draw a bright-line rule requiring the use of one method over the other, here, Regime has taken no affirmative steps to assume the Hales' mortgage. As a result, in determining whether the purchase price was grossly inadequate, we find it would be wholly inappropriate to add the value of the mortgage to Regime's winning bid. When the value of the mortgage is not added to Regime's winning bid, the bid shocks the conscience of the court. We therefore reverse the judicial sale and remand to the master-in-equity (the Master).

## I.

In April 1998, the Hales bought the Property for $104,250 and assumed the obligation to pay HOA dues. The HOA's covenants and restrictions provided:

> If the [HOA dues] assessment is not paid within thirty (30) days after the delinquency date, the assessment shall bear interest from the date of delinquency at the rate of eight percent per annum, and the [HOA] may bring legal action against the owner personally obligated to pay the same or may enforce or foreclose the lien against the lot or lots; and in the event judgment is obtained, such judgment shall include interest on the assessment as provided and a reasonable attorney's fee to be fixed by the court, together with costs of the action.

Petitioners fell behind paying their dues in January 2011. As a result, in April 2011, the HOA filed a lien against the Property in connection with the unpaid dues. The HOA subsequently filed a foreclosure complaint seeking the sale of the Property in exchange for satisfaction of $566.41 in principal and interest. Petitioners failed to answer or otherwise respond to the complaint, so the HOA submitted an affidavit of default. Following the affidavit of default, the Hales received no further notice of any proceedings or orders, including the judgment of

foreclosure or the foreclosure sale. *See* Rule 71(a), SCRCP ("Only parties who have appeared and filed pleadings in the [foreclosure] action shall be entitled to the usual notice of hearings and other proceedings . . . ."); Rule 77(d), SCRCP ("Immediately upon the entry of an order or judgment the clerk shall serve a notice of the entry by first class mail upon every party affected thereby who is not in default for failure to appear . . . .").

Nonetheless, at some point after the HOA filed its complaint but before the Master entered a default judgment against the Hales, the HOA sent the Hales a bill for $250 in connection with their past due regime fees. The Hales promptly paid the bill, thinking the payment resolved the matter. In fact, the law firm representing the HOA sent the Hales a notice that the lien had been satisfied. The HOA, however, did not withdraw its suit.

Three months after the HOA filed the affidavit of default, the Master entered a default Judgment of Foreclosure and Sale against the Hales, calculating the amount due to the HOA as $2,898.67, which was comprised of: (1) $250 in principal due;[1] (2) $80.87 in interest; (3) $542.80 in litigation costs, such as service and filing fees; and (4) $2,025 in attorney's fees. As a result, the Master authorized a judicial sale of the Property at public auction, noting the sale would be subject to senior encumbrances, including a mortgage. As noted above, the Hales were not served with this order. *See* Rule 77(d), SCRCP.

Two weeks later, the Property was sold at public auction, again without notice to the Hales. Regime was the highest bidder with a bid of $3,036.[2] Regime then sought a rule to show cause seeking to evict the Hales from the Property.

Having at last received notice of the proceedings via Regime's efforts to evict them, the Hales filed a motion to vacate the foreclosure sale, arguing the winning bid of $3,036 was so grossly inadequate as to shock the conscience of the court compared to the Property's fair market value of $128,000. Through an affidavit, Tina Hale explained the reason for the Hales' default:

---

[1] Specifically, the Master listed $500 in principal due, but credited the Hales for their $250 payment made after the HOA filed its complaint but before the order was filed.

[2] By that time, the amount due to the HOA had increased to $3,011.58. Therefore, Regime's bid resulted in a surplus of $24.42.

When we were served with the lawsuit to take away our home, I put the papers in a drawer and forgot about them. Some time after that, we received a bill from the HOA asking for the $250.00. I paid that without a problem. In November, we received a letter from the law firm of [the HOA] telling us that the Lien had been Satisfied. . . . I thought that everything was OK after that. The next thing I know, someone is knocking on my door telling me that they bought my home and that me and my family were being evicted.

At the subsequent rule to show cause hearing, the primary issue was whether and how to account for the senior mortgage in evaluating Regime's winning bid as a percentage of the Property's value. The Master apparently did not consider the fact that the Hales continued to make their monthly mortgage payment, and Regime had made no effort to assume responsibility for the senior mortgage. Ultimately, the Master denied the Hales' motion to vacate the sale, relying on this Court's plurality opinion in *Arrow Bonding Co. v. Warren*[3] and adopted the fiction that Regime had paid an "effective sales price" of $69,040, consisting of the successful bid ($3,036) plus the outstanding balance on the mortgage ($66,004). The Master reasoned this method of calculation of debt was appropriate because Regime was theoretically required to assume the mortgage in order to re-sell the Property.[4] As a result, the Master found the effective sale price ($69,040) was approximately 54% of the Property's fair market value ($128,000), and therefore it did not shock the conscience of the court.

On appeal, a majority of the court of appeals' panel affirmed. *Winrose Homeowners' Ass'n, Inc. v. Hale*, 423 S.C. 220, 813 S.E.2d 894 (Ct. App. 2018).

---

[3] 399 S.C. 603, 732 S.E.2d 622 (2012) (plurality opinion).

[4] In fact, the Hales demonstrated that Regime's business model is *not* to assume the senior mortgage, instead either (1) allowing the senior lienor to (re)foreclose on the purchased property, *or* (2) quitclaiming the foreclosed property back to the original homeowners in exchange for a hefty fee. *See* Pet'r's Br. at 12 n.4 ("An updated search of the Richland County public records shows that between November 4, 2013 and October 11, 2016: (1) Regime [] purchased 38 properties as to which a bank later foreclosed, meaning Regime [] did not pay off the [senior] mortgage; (2) Regime [] purchased 15 properties that it quitclaimed back to the owners for a profit between $2,911 and $13,984 per property; and (3) Regime [] purchased 6 properties of which it is still the owner of record and there is still an open mortgage."). Regime has not disputed or otherwise responded to these allegations.

Chief Judge Lockemy dissented, finding it was nonsensical to credit Regime for the balance of the outstanding mortgage because Regime had not actually assumed or made any attempt to assume the mortgage on the Property:

> A buyer at a judicial sale in which a senior lienholder is not a party takes the property subject to that lien, but the buyer is not responsible for its payment. The evidence in this case shows [the Hales] have continued to pay the mortgage for a home for which they have no title because they will suffer the severe consequences of default if they do not. The buyer [(Regime)] has paid nothing. I do not believe it proper to give a judicial sale buyer credit for assuming a debt which it is not legally required to pay.

*Id.* at 222–23, 813 S.E.2d at 900 (Lockemy, C.J., dissenting). We granted the Hales' petition for a writ of certiorari to review the court of appeals' decision.

## II.

A judicial sale will not be set aside due to an inadequate sale price unless: (1) the price was so grossly inadequate as to shock the conscience of the court; or (2) an inadequate—but not grossly inadequate—price at the sale is accompanied by other circumstances from which the court may infer fraud has been committed. *Singleton v. Mullins Lumber Co.*, 234 S.C. 330, 351, 108 S.E.2d 414, 424 (1959); *see also BFP v. Resolution Tr. Corp.*, 511 U.S. 531, 542 (1994) ("[I]t is 'black letter' law that mere inadequacy of the foreclosure sale price is no basis for setting the sale aside, though it may be set aside []under state foreclosure law . . . if the price is so low as to shock the conscience or raise a presumption of fraud or unfairness." (emphasis omitted) (some internal quotation marks omitted)); *In re Krohn*, 52 P.3d 774, 781 (Ariz. 2002) (en banc) (distinguishing between an inadequate price and a grossly inadequate price, and explaining a mere inadequate price must be accompanied by "some element of fraud, unfairness, or oppression," whereas a grossly inadequate price, standing alone, is prima facie proof of unfairness (emphasis omitted) (citing Restatement (Third) of Prop.: Mortgages § 8.3));[5] Restatement (Third) of Prop.: Mortgages § 8.3(a) (October 2019 Update) ("A foreclosure sale price obtained pursuant to a foreclosure proceeding that is

---

[5] Our court of appeals has made a similar distinction. *See E. Sav. Bank, FSB v. Sanders*, 373 S.C. 349, 358, 644 S.E.2d 802, 807 (Ct. App. 2007).

otherwise regularly conducted in compliance with applicable law does not render the foreclosure defective unless the price is grossly inadequate.").

South Carolina courts have not established a bright-line rule for what percentage of the sale price must be met with respect to the actual value of the property in order to shock the conscience of the court. However, as the court of appeals recently noted in an unrelated case, "a search of South Carolina jurisprudence reveals only when judicial sales are for less than [10%] of a property's actual value[] have our courts consistently held the discrepancy to shock the conscience of the court." *Bloody Point Prop. Owners Ass'n, Inc. v. Ashton*, 410 S.C. 62, 70, 762 S.E.2d 729, 734 (Ct. App. 2014) (citation omitted). Because the parties have not argued for us to either formally adopt this threshold or choose a different threshold (as other states have done), we will analyze the sale of the Property using the 10% threshold as the measure of whether the sale shocked the conscience. *But see* Restatement (Third) of Prop.: Mortgages § 8.3 cmt. b ("Generally, [] a court is warranted in invalidating a sale where the sale price is less than 20[%] of fair market value and, absent other foreclosure defects, is usually not warranted in invalidating a sale that yields in excess of that amount."); *id.* at Reporter's Note cmt. b (collecting cases from other jurisdictions that use different thresholds, ranging from 10% to 40% of the value of the foreclosed property).[6]

## III.

As alluded to above, there are two methods used to calculate whether a bid price is so grossly inadequate as to shock the conscience. The first method is known as the Debt Method, as it focuses on the amount of debt a foreclosure purchaser must incur before gaining a free-and-clear title to the foreclosed property. Under the Debt Method, the outstanding mortgage is considered a "debt" that must be assumed by the foreclosure purchaser before receiving a free-and-clear title, thereby freeing the purchaser to resell the foreclosed property to a third-party.

---

[6] It is worth noting that our appellate courts have never had the opportunity to consider a case in which the winning bid amounted to between 10% and 30% of the actual value of the property, and thus have not had an opportunity to set a different threshold. *But see Poole v. Jefferson Std. Life Ins. Co.*, 174 S.C. 150, 159–60, 177 S.E. 24, 28 (1934) (discussing with approval a case in which the Court affirmed the circuit court's decision to set aside a foreclosure sale with a winning bid of approximately 26% of the actual value of the property, although the Court did not use the "shock the conscience" language (citing *In re Ragland*, 172 S.C. 544, 174 S.E. 592 (1934))).

Thus, the Debt Method is a ratio comparing the foreclosure purchaser's total debt related to the property (i.e., the winning bid plus the amount of the outstanding mortgage) to the fair market value of the property. Here, using this method of calculation, a court would acknowledge Regime had paid (or will have to pay in the future) approximately 53.9% of the Property's value.[7]

In contrast, the second method of calculation is known as the Equity Method, as it focuses on the amount of equity the foreclosure purchaser stands to gain through the foreclosure sale. Under the Equity Method, the outstanding mortgage is considered a liability that devalues the purchased property, meaning the outstanding mortgage is subtracted from the fair market value of the property rather than added to the winning bid price. Thus, the Equity Method is a ratio comparing the winning bid price to the amount of equity (i.e. the fair market value minus the amount of the outstanding mortgage) in the foreclosed property. Here, using this alternative method of calculation, Regime has only paid approximately 4.9% of the Property's value—a percentage that falls below the 10% necessary to shock the conscience of the court, which would require us to overturn the sale.[8]

No appellate court in South Carolina has ever held courts must apply one method of calculation over the other. *See, e.g.*, *Arrow Bonding*, 399 S.C. at 606 & n.5, 732 S.E.2d at 624 & n.5 (applying the Debt Method, but specifically noting the parties had not challenged the propriety of this method of calculation on appeal, and the Court therefore would not consider alternative ways of calculating the percentage of the foreclosure sale, such as the Equity Method); *see also Winrose Homeowners' Ass'n*, 423 S.C. at 227, 813 S.E.2d at 898 ("*Arrow Bonding* does not conclusively establish whether the Debt or Equity Method is the law in South Carolina."). Nonetheless, in most circumstances, a foreclosure purchaser will assume any obligation to pay outstanding senior liens in order to obtain free-and-clear title to the property. In those cases, it follows the Debt Method should be used.

---

[7] Specifically, supposing Regime assumed the Hales' mortgage, its total debt incurred to obtain the Property would be $69,040 (the $3,036 winning bid plus the $66,004 outstanding mortgage), which is $53.9% of the Property's fair market value of $128,000.

[8] Specifically, Regime's $3,036 winning bid price is 4.9% of the $61,996 of equity in the Property (the $128,000 fair market value minus the $66,004 outstanding mortgage).

However, we reject the notion of a categorical, blind application of the Debt Method in all instances for exactly the circumstances presented in this case. Here, despite the foreclosure sale, the Hales have continued paying their mortgage and, thus, have continued to substantially reduce the amount of the outstanding senior lien. Just as Chief Judge Lockemy observed, it would be absurd under these circumstances to apply the Debt Method and give *Regime* credit for assuming the amount of the outstanding mortgage—it has taken no affirmative steps to legally obligate itself to take on the debt. Accordingly, the facts of this case demonstrate why, under certain circumstances, applying the Equity Method is the only logical option.

Under the Equity Method, Regime's bid accounted for approximately 4.9% of the value of the Property, which was far less than the 10% threshold we have looked to in the past. As a result, under the circumstances presented in this case, Regime's winning bid was so grossly inadequate as to shock the conscience of the court. We therefore set aside the foreclosure sale and remand to the Master for further proceedings, including accounting for the fact that the Hales have continued to pay the mortgage on the Property. Regardless of their previous default, we order the Master and the parties to give notice of any further proceedings to the Hales to ensure they are given an opportunity to participate.[9]

## IV.

We note our concern about this foreclosure proceeding. A foreclosure proceeding is a solemn judicial proceeding. While the HOA had the legal right to pursue collection of the debt owed, including foreclosure of the Property to satisfy that debt, this foreclosure action quickly morphed into a proxy to capitalize on a small debt. We are especially troubled by Regime's participation in a foreclosure proceeding to accommodate its business model of leveraging a nominal debt to secure an exorbitant return from homeowners who fear the prospect of eviction.[10]

---

[9] The issue of failing to give notice to the Hales of the foreclosure proceedings and sale is one of potential concern to the Court, despite the Hales' failure to respond to the initial summons and complaint. However, the absence of notice was not raised by the parties as an issue in this case, and we therefore do not address it. In any event, our reversal of the judicial sale renders the notice issue moot.

[10] Once they were aware the Property had been sold at a foreclosure sale, the Hales offered $9,000 to Regime to settle the approximately $3,000 debt. In response, Regime offered to let the Hales keep their home in exchange for a payment of $35,000. We acknowledge that settlement negotiations may not be considered "to

Regime's manipulation of the foreclosure proceeding is perhaps best illustrated by its practice of not following the typical foreclosure course and assuming responsibility for the senior mortgage.

However, Regime would not have had an opportunity to engage in its questionable business practices had the HOA and its attorney not chosen to pursue foreclosure in the first place. The Hales were minimally in arrears on their HOA dues, yet the HOA foreclosed on a $128,000 home in its eagerness to collect the outstanding $250—an overdue amount less than 0.2% of the fair market value of the home, notwithstanding the amount of the outstanding mortgage. The true nature of this foreclosure action is illustrated by the service and filing fees (which are more than double the amount of the principal due) and attorney's fees (which were *eight times* the amount of the principal due).

Similarly, at the initial hearing on Regime's rule to show cause, the circuit court commented the HOA's attorney's law firm "ha[d] become a pioneer in that whole effort [to treat defaulted regime fees as ruthlessly and quickly as defaulted mortgages] and ha[d] yet to convince anybody . . . that there's anything wrong with what [it was] doing." In response, the HOA's attorney brazenly bragged her firm had already received seven judgments in favor of various HOA clients in their first two to three years of business.

A foreclosure proceeding is a last resort, not a business model to be swiftly invoked for the purpose of exploiting property owners. We do not countenance the improper use of foreclosure proceedings by the HOA, its attorney, *or* Regime. It is the utilization of the Equity Method (in terms of determining the effective sale price of the Property) that restores an objective measure of reasonableness to the facts presented and achieves a proper resolution of this matter.

V.

Our decision today should not be read as a shift toward providing relief to homeowners despite their own poor choices, in particular here, falling behind on a minimal amount of HOA dues and subsequently failing to respond to the summons and complaint. Rather, there are serious consequences to default, and had the HOA and Regime pursued foreclosure in the normal course and made affirmative

---

prove liability for or invalidity of the claim or its amount." Rule 408, SCRE. Here, the settlement negotiations are referenced as evidence of Regime's manipulation of a foreclosure procedure to engage in strong-arm tactics.

efforts to assume the Hales' mortgage, this case could have turned out very differently.

However, under the unique facts of this case, the Hales have demonstrated Regime's winning bid price at the foreclosure sale—standing alone, as the outstanding mortgage cannot logically be added to it—is so grossly inadequate that it shocks the conscience of the court and cannot be sustained. For the foregoing reasons, we vacate the judicial sale of the Property and reverse and remand to the Master for further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**

**HEARN, FEW and JAMES, JJ., concur. BEATTY, C.J., concurring in a separate opinion.**

**CHIEF JUSTICE BEATTY:** I concur in the conclusion that the bid in this case is grossly inadequate and shocks the conscience. I would go a step further and adopt the Equity Method of determining an adequate sale price for residential property in a foreclosure action. Additionally, I would require that a homeowner, who is in default, receive notice of the date and time of the foreclosure sale.

Homeownership is the quintessential American dream. Purchasing a home is the largest investment that most South Carolinians will make. To allow the hard-earned equity to be confiscated by a bidder's minimal investment is unconscionable. This is especially troubling when the foreclosure sale is the result of an HOA lien.