615 S.E.2d 465

**Anne H. FLOYD, Respondent,**

**v.**

**Laurens W. FLOYD, Jr., individually and as Trustee of the Laurens Floyd Trust and the Charitable Remainder Trust of Laurens W. Floyd and Anne H. Floyd; Daniel D. Bozard as cotrustee of the Laurens Floyd Trust and the Charitable Remainder Trust of Laurens W. Floyd and Anne H. Floyd; Julia M. Floyd; and Robert H. Floyd, Individually,**

**of whom Laurens Floyd, Jr., individually and as Trustee of the Laurens Floyd Trust and the Charitable Remainder Trust of Laurens W. Floyd and Anne H. Floyd; Daniel Bozard as cotrustee of the Laurens Floyd Trust and the Charitable Remainder Trust of Laurens W. Floyd are the, Appellants.**

**No. 3997.**

Court of Appeals of South Carolina.

Submitted May 18, 2005.

Decided June 13, 2005.

60

62

64

M.M. Weinberg, Jr., of Sumter, for Appellants.

Clarke W. DuBose, and Sarah P. Spruill, both of Columbia, for Respondent.

ANDERSON, J.

Laurens Floyd, Jr. (Laurens) appeals a trial judge's order awarding Anne Floyd (Anne) approximately $40,000 in attorney's fees and removing him as trustee of a charitable remainder trust. We affirm.[1]

---

1. We decide this case without oral argument pursuant to Rule 215, SCACR.

## FACTUAL/PROCEDURAL BACKGROUND

On December 1, 1999, Laurens W. Floyd, Sr. (Floyd Sr.) executed an amended and restated trust agreement establishing several trusts, including Trust A for the benefit of his wife, Anne. Trust A is a qualified terminable interest property trust, known as a Q–Tip trust. According to the trust agreement, Floyd Sr.'s houses and lots in Pawley's Island, South Carolina and his stock in the Dillon Provision Company, Inc. (or the proceeds from the sale of such stock) were to fund Trust A. Trust A was to be administered as follows:

1. Commencing with the date of the Settlor's death, the Trustee shall pay to or for the benefit of the Settlor's wife, Anne H. Floyd, all of the net income from Trust A in convenient installments, but not less frequently than quarter-annually. Any accrued and undistributed income at the death of the Settlor's wife shall be paid to her personal representatives and administrators.

2. In addition, the Trustee may pay to or apply for the benefit of the Settlor's wife such sums from the principal of Trust A as in the Trustee's sole discretion shall be necessary or advisable from time to time for the medical care, education, support and maintenance in reasonable comfort of the Settlor's wife, taking into consideration to the extent the Trustee deems advisable any other income or resources of the Settlor's wife known to the Trustee.

The trust agreement directed the remainder interest go to Floyd Sr.'s children upon Anne's death.

Floyd Sr. was the original trustee of the trusts. Floyd Sr.'s son, Laurens, and his (Floyd Sr.'s) business associate, Bozard, were nominated to serve as co-trustees upon his death. In addition, the trust agreement provided upon the death or resignation of both Laurens and Bozard, First Citizen Bank and Trust Company of South Carolina (First Citizen's) was to serve as trustee.

Floyd Sr. created a separate charitable remainder trust, under which Anne was a lifetime income beneficiary, with the remainder interest passing to several charities. The charitable remainder trust document is not part of the record on appeal. However, it appears from the pleadings, correspondence, and trial testimony that the trust was established

March 13, 1996. As the lifetime beneficiary, Anne was to receive 8% of the value of the trust each year. Although the case caption suggests otherwise, Bozard did not serve with Laurens as trustee for the charitable remainder trust. Laurens was the sole trustee.

In February 2000, Floyd Sr. died, and Laurens and Bozard began serving as trustees of Trust A. Trust A was funded with the two Pawley's Island homes and the Dillon Provision Company stock. Anne began residing in one of the Pawley's Island homes. The trust rented the other home for $400 per month.

Approximately a year after Floyd Sr.'s death, Laurens sent a letter to Anne, his stepmother, explaining the administration of Trust A. Laurens wrote:

Dear Anne:

. . . .

To facilitate the handling of the trust assets, a money market account will be opened with Edward Jones. The income from the assets, currently rent from the rental house, will be deposited into this account. On a quarterly basis, we will issue you a check of the accrued income from the QTIP Trust. Expenses incurred by the real property of the trust such as property taxes; property casulty [sic], liability, and flood insurance; upkeep and maintenance, etc., you will then be expected to pay for. Any of the above expenses which exceed the income generated by the assets of the QTIP trust are, according to the terms of the QTIP Trust, your personal responsibility.

Anne disagreed with Laurens' interpretation of the trust agreement and sought assistance from attorney Donnie Dial. Dial wrote letters to Charles Curry, the attorney for Floyd's estate, asserting the trust was responsible for expenses relating to trust property. Anne and Laurens engaged in several disagreements as to who was responsible for payment of various expenses related to the trust properties, including repairs to the roof of the rental house, replacement of the heat pump in Anne's house, payment of flood insurance and general property insurance, and payment of property taxes. Laurens took the position that the trust was not responsible for the payment of these expenses.

In October 2001, Anne brought an action in probate court against Laurens and Bozard individually and as co-trustees. Anne sought an accounting of both Trust A and the charitable remainder trust, and a declaratory judgment requiring the trustees to (1) repay any advances Anne paid on behalf of Trust A, (2) reinstate flood insurance on the properties, and (3) sell the Dillon Provision Company stock and reinvest the proceeds. In addition, Anne petitioned for the removal of Laurens and Bozard as co-trustees of Trust A and Laurens as trustee of the charitable remainder trust.

The case was removed to the circuit court. The trial judge issued an interim order, which stated:

[C]ounsel for petitioner brought to the Court's attention that the trustees are failing to pay expenses of the Trust, including but not limited to real property taxes, flood insurance, and capital improvements such as a new roof for the rental house owned by the Trust and a new heat pump for the home owned by the Trust and occupied by Mrs. Floyd.

Although he was not prepared to rule on the interpretation of the trust provisions, the trial judge indicated his concern about the preservation of the trust property. Thus, he ordered:

[T]he Trust shall pay for all costs of upkeep, repair, and protection of the Trust assets, including but not limited to the taxes, insurance, repairs, and upkeep on the two Pawley's Island houses, and that such expenses are to be paid by the trustees first out of Trust income and then, if necessary, out of Trust principal.

After the trial judge issued this order, First Citizen's filed a motion to intervene as an interested party, which was granted.[2]

Subsequently, Anne filed a motion for a rule to show cause based on the trustees' failure to comply with the trial judge's interim order. Anne argued the trust failed to pay for the installation of a new heat pump in the house in which she resides, as required by the interim order. The trial judge held a hearing on this motion, found Laurens in contempt of

---

2. First Citizen's Bank and Laurens entered into a settlement agreement during the pendency of this appeal resolving all matters between them. Therefore, First Citizen's Bank is not a party to this appeal.

court, and ordered him to pay attorney's fees incurred by Anne in enforcing the order. In addition, the trial judge addressed Laurens' argument that the trust was not responsible for the payment of the heat pump because of the provision in the trust agreement giving the trustee the discretionary power to invade the trust principal. The trial judge determined that provision did not pertain to the expenditures for maintenance of trust property. After this order, the trial judge issued another order reflecting Laurens' and Bozard's decisions to voluntarily withdraw as trustees of Trust A.

Ultimately, the trial judge held a hearing on the merits of Anne's complaint. At the hearing, Laurens objected to the admission of several letters written by Dial on behalf of Anne and letters authored by Curry. Laurens argued all of the letters were written by out-of-court declarants and, therefore, constituted inadmissible hearsay. In addition, he maintained the letters from Curry to Laurens were protected by the attorney-client privilege and thus were not admissible. The trial judge did not rule on the admissibility of the letters, but asked the parties to submit briefs supporting their positions. After the parties submitted their briefs, the trial judge ruled the Dial letters were not admitted to show the truth of the matter asserted, but "to show that the co-trustees were placed on notice as to [Anne's] position and to show her efforts to resolve this matter without litigation." The judge noted Dial's opinions contained in the letters were cumulative because the court already had interpreted the trust as requiring the trustees to protect the trust property. Additionally, the trial judge found the letters written by Curry to Laurens were not privileged because "the advice of an attorney to the trustee is not privileged from the trust beneficiaries." Furthermore, the trial judge stated Laurens waived the privilege by producing the letters in discovery, and opened the door to admission of the letters by claiming he followed the advice of counsel.

The trial judge issued a final order finding Laurens acted in bad faith and breached his fiduciary duties to Anne by (1) failing to pay the expenses of Trust A, (2) not making timely distributions of Trust A income to Anne, (3) neglecting to provide Anne an accounting of both trusts, (4) misstating the terms of Trust A, (5) managing Trust A property solely for the benefit of the remainder beneficiaries, (6) not following the

advice of counsel as to his duties as a trustee, and (7) failing to follow court orders. Based on these findings, Laurens was held personally liable for $40,347.21 of Anne's attorney's fees and $22,331.60 of First Citizen's attorney's fees. In making this determination, the trial judge stated: "the assessment of fees and costs against Floyd, Jr. as herein specified, is not an award of attorneys' fees, per se, but rather an assessment of sanctions against Floyd, Jr. for his contempt of court, together with an award of damages to Wife and Bank for his breach of fiduciary duty." Further, the trial judge removed Laurens as trustee of the charitable remainder trust, explaining, "While Floyd, Jr.'s actions in this case were not dishonest, they strongly support his removal as trustee from any trust affecting Wife."

## I. Contempt and Sanctions

Laurens argues the trial judge erred in finding him in contempt. He asserts because all income from the trust must be paid to Anne, the trust did not have funds to pay for expenses related to the trust property. Therefore, he contends an invasion of the trust principal would be necessary to pay those expenses. Relying on the provision of the trust granting the trustee discretion to invade the principal for Anne's benefit, Laurens argues he properly exercised his discretion and chose not to invade the principal. Laurens maintains the trial judge abused his discretion in holding him in contempt for failure to pay for replacement of the heat pump in the home in which Anne resides. According to Laurens, the trial judge's order was unlawful and he was not required to obey that order.

Additionally, Laurens argues that even if the court did not err in holding him in contempt, the sanctions imposed were so disproportionate to the contempt as to constitute reversible error.

### A. Standard of Review

A decision on contempt rests within the sound discretion of the trial court. *Fagan v. Timmons,* 224 S.C. 286, 78 S.E.2d 628 (1953); *Tirado v. Tirado,* 339 S.C. 649, 530 S.E.2d 128 (Ct.App.2000). "On appeal, a decision regarding contempt should be reversed only if it is without evidentiary support or

the trial judge has abused his discretion." *Stone v. Reddix–Smalls*, 295 S.C. 514, 516, 369 S.E.2d 840, 840 (1988) (citing *Means v. Means*, 277 S.C. 428, 288 S.E.2d 811 (1982); *Fagan v. Timmons*, 224 S.C. 286, 78 S.E.2d 628 (1953)); *see also Widman v. Widman*, 348 S.C. 97, 120, 557 S.E.2d 693, 705 (Ct.App.2001) ("A determination of contempt is within the sound discretion of the trial judge, but his discretion will be reversed when the finding is without evidentiary support or there is an abuse of discretion."). "A determination of contempt is a serious matter and should be imposed sparingly; whether it is or is not imposed is within the discretion of the trial judge, which will not be disturbed on appeal unless it is without evidentiary support." *Haselwood v. Sullivan*, 283 S.C. 29, 32–33, 320 S.E.2d 499, 501 (Ct.App.1984) (citing *Hicks v. Hicks*, 280 S.C. 378, 312 S.E.2d 598 (Ct.App.1984)).

## B. Law/Analysis

### 1. Law of the Case

The finding of contempt and the award of fees are the law of the case. First, a finding of contempt is immediately appealable regardless of whether damages have been determined. *Hooper v. Rockwell*, 334 S.C. 281, 291, 513 S.E.2d 358, 364 (1999); *Arnal v. Arnal*, 363 S.C. 268, 297, 609 S.E.2d 821, 837 (Ct.App.2005); *Jarrell v. Petoseed Co.*, 331 S.C. 207, 208, 500 S.E.2d 793, 793 (Ct.App.1998). Laurens did not appeal the December 24 order finding him in contempt. An unappealed ruling becomes the law of the case. *ML–Lee Acquisition Fund, L.P. v. Deloitte Touche*, 327 S.C. 238, 241, 489 S.E.2d 470, 472 (1997). Therefore, the December 24 order which found Laurens in contempt and which was not appealed is the law of the case.

Second, the trial judge's decision to award attorney's fees as both a contempt sanction and damages is the law of the case. The trial judge, in his final order, directed Laurens to pay Anne's and First Citizen's attorney's fees as both damages and as a contempt sanction for his violation of the trial judge's prior order. Laurens, however, solely appeals the trial judge's award of attorney's fees as a contempt sanction. Therefore, because the trial judge based his award of attorney's fees and costs on more than one ground, the unappealed

ground becomes the law of the case. *Anderson v. Short,* 323 S.C. 522, 525, 476 S.E.2d 475, 477 (1996).

Further, Laurens failed to challenge the amount of the attorney's fees awarded either during the hearing when Anne's attorney submitted his attorney fee affidavit or in a subsequent Rule 59(e), SCRCP motion to alter or amend the trial judge's order. An issue cannot be raised for the first time on appeal, but must have been raised to and ruled upon by the trial judge to be preserved for appellate review. *Staubes v. City of Folly Beach,* 339 S.C. 406, 529 S.E.2d 543 (2000); *Jones v. Daley,* 363 S.C. 310, 609 S.E.2d 597 (Ct.App. 2005). "Imposing this preservation requirement on the appellant is meant to enable the lower court to rule properly after it has considered all relevant facts, law, and arguments." *I'On, L.L.C. v. Town of Mt. Pleasant,* 338 S.C. 406, 422, 526 S.E.2d 716, 724 (2000). "Without an initial ruling by the trial court, a reviewing court simply would not be able to evaluate whether the trial court committed error." *Ellie, Inc. v. Miccichi,* 358 S.C. 78, 103, 594 S.E.2d 485, 498 (Ct.App.2004). When a trial judge makes a general ruling on an issue, but does not address the specific argument raised by the appellant and the appellant does not make a motion to alter or amend pursuant to Rule 59(e), SCRCP, to obtain a ruling on the argument, the appellate court cannot consider the argument on appeal. *Noisette v. Ismail,* 304 S.C. 56, 58, 403 S.E.2d 122, 124 (1991).

Although the contempt finding and the award of fees are the law of the case, we nonetheless find the trial judge correctly decided both issues.

### 2. Contempt

Adverting our analysis to the substance of Laurens' arguments, we find them without merit. "The power to punish for contempt is inherent in all courts. Its existence is essential to the preservation of order in judicial proceedings, and to the enforcement of the judgments, orders and writs of the courts, and consequently to the due administration of justice." *Curlee v. Howle,* 277 S.C. 377, 382, 287 S.E.2d 915, 917 (1982) (citing *McLeod v. Hite,* 272 S.C. 303, 251 S.E.2d 746 (1979); *State v. Goff,* 228 S.C. 17, 88 S.E.2d 788 (1955)); *see also In re Brown,* 333 S.C. 414, 420, 511 S.E.2d 351, 355 (1998)

("The power to punish for contempt is inherent in all courts and is essential to preservation of order in judicial proceedings.") (citation omitted); *State ex rel. McLeod v. Hite*, 272 S.C. 303, 251 S.E.2d 746 (1979) (instructing that a court has the inherent authority to punish offenses calculated to obstruct, degrade, and undermine the administration of justice, and such power cannot be abridged). "The court's power includes the ability to maintain order and decorum." *Stone v. Reddix–Smalls*, 295 S.C. 514, 516, 369 S.E.2d 840, 841 (1988).

Contempt results from the willful disobedience of an order of the court, and before a court may hold a person in contempt, the record must clearly and specifically demonstrate the acts or conduct upon which such finding is based. *Curlee* at 382, 287 S.E.2d at 918; *accord Hawkins v. Mullins*, 359 S.C. 497, 501, 597 S.E.2d 897, 899 (Ct.App.2004); *Cheap–O's Truck Stop, Inc. v. Cloyd*, 350 S.C. 596, 606, 567 S.E.2d 514, 519 (Ct.App.2002). Civil contempt must be proved by clear and convincing evidence. *Durlach v. Durlach*, 359 S.C. 64, 71, 596 S.E.2d 908, 912 (2004) (citation omitted). A willful act is "one done voluntarily and intentionally with the specific intent to do something the law forbids, or with the specific intent to fail to do something the law requires to be done; that is to say with bad purpose either to disobey or disregard the law." *State v. Bevilacqua*, 316 S.C. 122, 129, 447 S.E.2d 213, 217 (Ct.App.1994) (internal quotation marks and citation omitted); *accord Widman v. Widman*, 348 S.C. 97, 119, 557 S.E.2d 693, 705 (Ct.App.2001).

Intent for purposes of criminal contempt is subjective, not objective, and must necessarily be ascertained from all the acts, words, and circumstances surrounding the occurrence. *Bevilacqua*, 316 S.C. at 129, 447 S.E.2d at 217 (citing *State v. Bowers*, 270 S.C. 124, 241 S.E.2d 409 (1978)). "Where a contemnor is unable, without fault on his part, to obey an order of the court, he is not to be held in contempt." *Smith–Cooper v. Cooper*, 344 S.C. 289, 301, 543 S.E.2d 271, 277 (Ct.App.2001) (citations omitted).

"In order to sustain a finding of contempt, the record must be clear and specific as to the acts or conduct upon which such finding is based." *Spartanburg County Dept. of Soc. Servs. v. Padgett*, 296 S.C. 79, 83, 370 S.E.2d 872,

874 (1988) (citation omitted). "In a proceeding for contempt for violation of a court order, the moving party must show the existence of a court order and the facts establishing the respondent's noncompliance with the order." *Hawkins,* 359 S.C. at 501, 597 S.E.2d at 899 (citing *Eaddy v. Oliver,* 345 S.C. 39, 42, 545 S.E.2d 830, 832 (Ct.App.2001)). "Once the movant makes a prima facie showing by pleading an order and demonstrating noncompliance, the burden shifts to the respondent to establish his defense and inability to comply." *Eaddy,* 345 S.C. at 42, 545 S.E.2d at 832 (internal quotation marks and citation omitted).

In *State v. Kennerly,* 337 S.C. 617, 524 S.E.2d 837 (1999), our supreme court noted the difference between constructive and direct contempt:

Constructive contempt is contempt that occurs "outside the presence of the court." [*Toyota of Florence v. Lynch,* 314 S.C. 257,] 267, 442 S.E.2d [611,] 617 [ (1994) ]; *State v. Johnson,* 249 S.C. 1, 152 S.E.2d 669 (1967). In contrast, direct contempt involves contemptuous conduct occurring in the presence of the court. *State v. Goff,* 228 S.C. 17, 88 S.E.2d 788 (1955).

*Id.* at 620, 524 S.E.2d at 838 (1999).

Contempt can be either civil or criminal. *Poston v. Poston,* 331 S.C. 106, 502 S.E.2d 86 (1998), provides an erudite and comprehensive explication of the differences between civil and criminal contempt:

The major factor in determining whether a contempt is civil or criminal is the purpose for which the power is exercised, including the nature of the relief and the purpose for which the sentence is imposed. The purpose of civil contempt is to coerce the defendant to do the thing required by the order for the benefit of the complainant. The primary purposes of criminal contempt are to preserve the court's authority and to punish for disobedience of its orders. If it is for civil contempt the punishment is remedial, and for the benefit of the complainant. But if it is for criminal contempt the sentence is punitive, to vindicate the authority of the court.

An unconditional penalty is criminal in nature because it is solely and exclusively punitive in nature. The relief

cannot undo or remedy what has been done nor afford any compensation and the contemnor cannot shorten the term by promising not to repeat his offense. If the relief provided is a sentence of imprisonment, . . . it is punitive if the sentence is limited to imprisonment for a definite period. If the sanction is a fine, it is punitive when it is paid to the court. However, a fine that is payable to the court may be remedial when the contemnor can avoid paying the fine simply by performing the affirmative act required by the court's order.

In civil contempt cases, the sanctions are conditioned on compliance with the court's order. The conditional nature of the punishment renders the relief civil in nature because the contemnor can end the sentence and discharge himself at any moment by doing what he had previously refused to do. If the relief provided is a sentence of imprisonment, it is remedial if the defendant stands committed unless and until he performs the affirmative act required by the court's order. . . . Those who are imprisoned until they obey the order, carry the keys of their prison in their own pockets. If the sanction is a fine, it is remedial and civil if paid to the complainant even though the contemnor has no opportunity to purge himself of the fine or if the contemnor can avoid the fine by complying with the court's order.

Civil contempt must be proven by clear and convincing evidence. In a criminal contempt proceeding, the burden of proof is beyond a reasonable doubt.

. . . .

In a civil contempt proceeding, a contemnor may be required to reimburse a complainant for the costs he incurred in enforcing the court's prior order, including reasonable attorney's fees. The award of attorneys fees is not a punishment but an indemnification to the party who instituted the contempt proceeding. Thus, the court is not required to provide the contemnor with an opportunity to purge himself of these attorney's fees in order to hold him in civil contempt. A governmental body, as a complainant, may recover attorney's fees in a successful contempt proceeding, provided no statute prohibits recovery. Although usually a complainant is not entitled to attorney's fees in a criminal contempt proceeding, depending on the circum-

stances, such an award may be proper. After all, the award of attorney's fees is not part of the punishment; instead, this award is made to indemnify the party for expenses incurred in seeking enforcement of the court's order.

*Poston,* 331 S.C. at 111–15, 502 S.E.2d at 88–91 (internal quotation marks and citations omitted). A criminal contemnor may not be sentenced to more than six months in prison unless he is afforded a trial by jury. *See State v. Passmore,* 363 S.C. 568, 611 S.E.2d 273 (Ct.App.2005) (citing *Bloom v. Illinois,* 391 U.S. 194, 88 S.Ct. 1477, 20 L.Ed.2d 522 (1968)).

██ The trial judge issued an order requiring Laurens, as trustee, to pay all "cost of upkeep, repair, and protection of the Trust assets, including but not limited to the taxes, insurance, repairs, and upkeep on the two Pawley's Island houses . . . ." Laurens clearly violated this order when he refused to pay for the heat pump for one of the homes. Thus, the trial judge did not abuse his discretion by finding Laurens in contempt for willfully disobeying the order.

██ Furthermore, we reject Laurens' assertion that the order was unlawful and that he therefore is excused from complying with the order. The trial judge correctly interpreted the trust provisions. In his order finding Laurens' in contempt, the trial judge addressed Laurens contention that the decision whether or not to invade the trust principal to pay for expenses related to the trust property was left to his and Bozard's discretion. The trial judge determined the provision Laurens relies upon "does not pertain to the expenditures and maintenance of the Trust property and for Trust expenses." We agree.

The clause in Trust A relied upon by Laurens states:

2. In addition, the Trustee may pay to or apply for the benefit of the Settlor's wife such sums from the principal of Trust A as in the Trustee's sole discretion shall be necessary or advisable from time to time for the medical care, education, support and maintenance in reasonable comfort of the Settlor's wife, taking into consideration to the extent the Trustee deems advisable any other income or resources of the Settlor's wife known to the Trustee.

This provision does not address payment of expenses relating to property of the trust. We emphasize that this clause is

directed towards *Anne's* well-being and does not concern preservation of the *trust* property.

The trust agreement specifically provides under the section labeled "Trustee Powers":

> The Trustee and any successors in the capacity of fiduciaries are authorized in their discretion with respect to any property, real or personal, at any time held under any provision of this Trust and without authorization by any court and in addition to any other rights, powers, authority and privileges granted by any other provision of this Trust or by statute or general rules of law (subject to the limitations of the Article immediately following this Article):
>
> . . . .
>
> 26. To permit the Settlor's wife to occupy rent free any residence constituting a part of the assets of a trust of which the Settlor's wife is a beneficiary and to permit any other beneficiary or beneficiaries to occupy rent free any residence constituting a part of the assets of a trust for a beneficiary or beneficiaries and to pay the real property taxes thereon, expenses of maintaining the residence in suitable repair and condition and hazard insurance premiums on the residence; provided, however, the Trustee shall not exercise this power in any way which would deprive the Settlor's wife under Trust A of the beneficial enjoyment of Trust A and the Settlor's wife shall have the right to limit, restrict, or terminate Trustee's exercises of this power if it interferes with the beneficial enjoyment.

The trust property belongs to the trust. Pursuant to paragraph 26, the trustees may permit Anne or any other beneficiary to occupy rent free a residence owned by the trust. However, nothing in the trust agreement authorizes the trust to require a beneficiary to pay the taxes, insurance, and maintenance expenses of a trust-owned house. The trust, as owner, carries the responsibility for these items.

Employing a tortured interpretation of the trust agreement, Laurens breached his duties to Anne, neglected to pay expenses of Trust A, and ignored a court order. The trial judge did not abuse his discretion in finding Laurens in contempt.

### 3. Sanctions

Laurens argues that even if he was properly found in contempt, the trial judge erred in awarding sanctions in disproportion to his contempt. He asserts the amount of attorney's fees is excessive and some of the charges awarded relate to matters other than his contempt. However, because the trial judge awarded the fees both as sanctions and damages, we affirm.

 Laurens correctly recognizes compensatory contempt is intended to restore the injured party to his original position prior to the contemnor's action and, therefore, is limited to the party's actual damages. *See Whetstone v. Whetstone*, 309 S.C. 227, 235, 420 S.E.2d 877, 881 (Ct.App.1992) ("Compensatory contempt is money awarded to a party who is injured by a contemnor's action to restore the party to his original position. The award should be limited to the party's actual loss.") (citations omitted).

*Curlee v. Howle*, 277 S.C. 377, 287 S.E.2d 915 (1982), explains the law of compensatory contempt with exactitude:

> Compensatory contempt is a money award for the plaintiff when the defendant has injured the plaintiff by violating a previous court order. The goal is to indemnify the plaintiff directly for harm the contemnor caused by breaching the injunction. Rendleman, Compensatory Contempt: Plaintiff's Remedy When A Defendant Violates An Injunction, 1980 Ill.L.F. 971. Courts utilize compensatory contempt to restore the plaintiff as nearly as possible to his original position. Therefore it is remedial.

> We have recognized compensatory contempt in at least two cases. In Ex Parte Thurmond, 1 Bailey 605 (1830), we stated that when an individual right is directly involved in a contempt proceeding, the court has the power to order the contemnor to place the injured party in as good a situation as he would have been if the contempt had not been committed, or to suffer imprisonment. In *Lorick Lowrance v. Motley*, 69 S.C. 567, 48 S.E. 614 (1904), we held that a contemnor may be required to pay damages suffered by reason of his contemptuous action or suffer imprisonment. The defendant was ordered to pay to the plaintiff the value

of the trees he had destroyed in disregard of the court's order.

> When . . . property of an individual is taken or destroyed in contempt of the court's order, those interested have a right to ask of the court its restoration or payment of its value at the hands of the offender, and the court requires such restoration as part of the punishment. [69 S.C. 567] 49 [48] S.E. at page 615.

Compensatory contempt awards have been affirmed also by the United States Supreme Court.

> Judicial sanctions in civil contempt proceedings may, in a proper case, be employed for either or both of two purposes: to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained. Where compensation is extended, a fine is imposed, payable to the complainant. Such fine must of course be based upon evidence of complainant's actual loss. . . .

*United States v. United Mine Workers of America,* 330 U.S. 258, 304–305, 67 S.Ct. 677, 701–702, 91 L.Ed. 884 (1947).

> Therefore, the compensatory award should be limited to the complainant's actual loss. Included in the actual loss are the costs in defending and enforcing the court's order, including litigation costs and attorney's fees. The burden of showing what amount, if anything, the complainant is entitled to recover by way of compensation should be on the complainant.

*Curlee,* 277 S.C. at 386–87, 287 S.E.2d at 919–20; *accord Cheap-O's Truck Stop, Inc. v. Cloyd,* 350 S.C. 596, 567 S.E.2d 514 (Ct.App.2002).

Further, this Court, in *Harris–Jenkins v. Nissan Car Mart, Inc.,* 348 S.C. 171, 557 S.E.2d 708 (Ct.App.2001), wrote:

> Courts, by exercising their contempt power, can award attorney's fees under a compensatory contempt theory. Compensatory contempt seeks to reimburse the party for the costs it incurs in forcing the non-complying party to obey the court's orders. *See Poston v. Poston,* 331 S.C. 106, 114, 502 S.E.2d 86, 90 (1998) ("In a civil contempt proceeding, a contemnor may be required to reimburse a complainant for the costs he incurred in enforcing the court's prior

order, including reasonable attorney's fees. The award of attorney's fees is not a punishment but an indemnification to the party who instituted the contempt proceeding."); *Lindsay v. Lindsay,* 328 S.C. 329, 345, 491 S.E.2d 583, 592 (Ct.App.1997) ("A compensatory contempt award may include attorney fees.") (citation omitted); *Curlee v. Howle,* 277 S.C. 377, 386–87, 287 S.E.2d 915, 919–20 (1982) ("Compensatory contempt is a money award for the plaintiff when the defendant has injured the plaintiff by violating a previous court order.... Included in the actual loss are the costs of defending and enforcing the court's order, including litigation costs and attorney's fees.").

*Harris–Jenkins,* 348 S.C. at 178–79, 557 S.E.2d at 711–12.

 The trial judge awarded attorney's fees and costs to Anne not only as a sanction for Laurens' contempt, but also as "an award of damages to Wife and Bank for [Laurens'] breach of his fiduciary duty." Therefore, the law does not limit the award to actual damages flowing from Laurens' contempt. The portion of the sum that cannot be characterized as compensatory contempt—i.e., actual damages attributable to Laurens' contempt—is accounted for in the additional damages award. Although the fees were not awarded as attorney's fees per se, the trial court nevertheless analyzed the attorney's fee affidavits and found the fees reasonable pursuant to *Taylor v. Medenica,* 331 S.C. 575, 580, 503 S.E.2d 458, 461 (1998). Thus, we find no error in the award of $40,347.21 in attorney's fees to Anne to be paid by Laurens.

## II. Admissibility of Letters

Laurens argues the trial judge abused his discretion in admitting into evidence letters written by attorneys Dial and Curry. First, he contends these letters constitute inadmissible hearsay because neither Dial nor Curry testified at the trial. In addition, Laurens maintains he had an attorney-client relationship with Curry, and therefore, letters written by Curry to Laurens were inadmissible pursuant to the attorney-client privilege. We disagree.

### A. Standard of Review

 The admission of evidence is within the trial court's discretion. *R & G Constr., Inc. v. Lowcountry Reg'l*

*Transp. Auth.,* 343 S.C. 424, 439, 540 S.E.2d 113, 121 (Ct.App. 2000) (citing *Washington v. Whitaker,* 317 S.C. 108, 451 S.E.2d 894 (1994)); *Haselden v. Davis,* 341 S.C. 486, 534 S.E.2d 295 (Ct.App.2000), *aff'd* 353 S.C. 481, 579 S.E.2d 293 (2003); *Cudd v. John Hancock Mut. Life Ins. Co.,* 279 S.C. 623, 310 S.E.2d 830 (Ct.App.1983). The court's ruling to admit or exclude evidence will only be reversed if it constitutes an abuse of discretion amounting to an error of law. *R & G Construction* at 439, 540 S.E.2d at 121; *Elledge v. Richland/Lexington School Dist. Five,* 352 S.C. 179, 185, 573 S.E.2d 789, 792 (2002); *see also Whaley v. CSX Transp., Inc.,* 362 S.C. 456, 609 S.E.2d 286 (2005) (observing admission of evidence will not be reversed absent an abuse of discretion); *Gamble v. Int'l Paper Realty Corp.,* 323 S.C. 367, 474 S.E.2d 438 (1996) (noting admission or exclusion of evidence will not be disturbed on appeal absent clear abuse). The trial judge's decision will not be reversed on appeal unless it appears he clearly abused his discretion and · the objecting party was prejudiced by the decision. *S.C. Prop. & Cas. Guar. Ass'n v. Yensen,* 345 S.C. 512, 548 S.E.2d 880 (Ct.App.2001); *Sullivan v. Davis,* 317 S.C. 462, 454 S.E.2d 907 (Ct.App.1995); *Cudd,* 279 S.C. 623, 310 S.E.2d 830.

 The determination whether the attorney-client privilege applies is within the sound discretion of the trial judge, and his decision will not be reversed absent an abuse of discretion. *Ross v. Med. Univ. of South Carolina,* 317 S.C. 377, 453 S.E.2d 880 (1994) (citing *State v. Love,* 275 S.C. 55, 271 S.E.2d 110 (1980)).

## B. Law/Analysis

### 1. Not Offered for the Truth of the Matter Asserted

 Rule 801, SCRE, defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." *See Burton v. York County Sheriff's Dept.,* 358 S.C. 339, 594 S.E.2d 888 (Ct.App.2004). "A statement that is not offered to prove the truth of the matter asserted should not be excluded as hearsay." *R & G Constr., Inc. v. Lowcountry Reg'l Transp. Auth.,* 343 S.C. 424, 439, 540 S.E.2d 113, 121 (Ct.App.2000); *see also State v. Thompson,* 352 S.C. 552, 558,

575 S.E.2d 77, 81 (Ct.App.2003) ("Evidence is not hearsay unless it is an out of court statement offered to prove the truth of the matter asserted.") (citation omitted). *See, e.g., Hawkins v. Pathology Assocs. of Greenville, P.A.,* 330 S.C. 92, 498 S.E.2d 395 (Ct.App.1998) (finding, in a wrongful death action, that letters and a card the deceased wrote to her husband and children were not hearsay because they were offered to show the close relationship among the family and not to prove the truth of any matter asserted in the writings).

For example, in *Player v. Thompson,* 259 S.C. 600, 193 S.E.2d 531 (1972), the plaintiff, Player, was injured while a passenger in an automobile driven by Nancy Carder. Bobby Thompson owned the car. Player initiated an action against Carder for "heedlessness and recklessness in the operation of the automobile," and she sued Bobby Thompson and his wife, Geraldine, under the family purpose doctrine for negligent entrustment of the automobile. *Id.* at 604, 193 S.E.2d at 533. A hearsay issue arose when Player sought to introduce Carder's statement

> that she (Carder) went with Geraldine Thompson, two or three weeks before the collision, to a motor vehicle inspection station. She said that the inspector refused Mrs. Thompson a sticker because 'she needed two tires.' She stated she heard the inspector 'tell her (Mrs. Thompson) and she (Mrs. Thompson) told me.'—"The man told her that . . . she needed two more to pass inspection."

*Id.* at 608, 193 S.E.2d at 534. The trial court refused to admit the evidence. The *Player* court explained:

> After the trial judge declined to admit the statement in evidence, counsel for plaintiff called defendant Carder as a witness. He attempted to ask her about the inspection station incident in an effort to show that both she (Carder) and Mrs. Thompson had notice of the slick tires. Defense counsel's objection was sustained on the ground that it was hearsay.

> In C. McCormick, Law of Evidence s 225 (1954) hearsay evidence is defined:

> > 'Hearsay evidence is testimony in court or written evidence, of a statement made out of court, such statement being offered as an assertion to show the truth of matters

asserted therein, and thus resting for its value upon the credibility of the out-of-court asserted.'

Our Court has recognized this sound and very basic proposition in *Watson v. Wall*, 239 S.C. 109, 121 S.E.2d 427 (1961). Also see 5 Wigmore on Evidence s 1361 (3rd ed.1940).

'If, then, an utterance can be used as circumstantial evidence, i.e. without inferring from it as an assertion to the fact asserted, the Hearsay rule does not oppose any barrier, because it is not applicable.' 6 Wigmore on Evidence s 1788 (3rd ed.1940).

It would not be improper in this case for the plaintiff to elicit testimony from Nancy Carder that a filling station attendant stated to both Mrs. Thompson and her that the automobile had bad tires. It would be receivable, not as a testimonial assertion by the attendant to prove the fact of slick tires, but as indicating that Nancy Carder and Mrs. Thompson obtained knowledge of the slick tires, the fact of slick tires being proved by other evidence.

Inasmuch as the testimony was not offered to prove the truth of the matter asserted, but solely to prove notice, which is a state of mind, the hearsay rule does not apply.

*Player*, 259 S.C. at 609–10, 193 S.E.2d at 535.

The trial judge determined, and we agree, Anne offered these letters into evidence not to prove the truth of Dial's and Curry's statements, but to show the trustees were placed on notice of Anne's position as to the payment of expenses associated with trust property. Additionally, admission of the Curry letters demonstrates Laurens did not follow his counsel's advice. The credibility of the contents of the letters was not at issue. Rather, the letters are probative of (1) Laurens' awareness of Anne's position, and (2) Laurens' failure to follow the advice of his attorney.

Finally, Laurens was not prejudiced by the admission of the letters. The trial judge had already determined in the rule to show cause hearing that Laurens had a duty to pay trust expenses and to provide an accounting of the trusts. Therefore, the interpretation of the trust was not at issue when the trial judge received these letters into evidence.

Accordingly, we find the trial judge did not abuse his discretion in admitting the letters.

## 2. Attorney–Client Privilege

The trial judge determined admission of the Curry letters did not violate the attorney-client privilege because (1) the privilege does not apply to Anne as she is a beneficiary of the trust, and communications between a trustee and an attorney for a trust are not privileged as to trust beneficiaries; (2) even if the privilege were to apply it was waived when Laurens produced the letters in discovery; and (3) Laurens opened the door to the introduction of the letters by his repeated testimony that he relied on counsel's advice. We agree with each ground for admitting the letters.

### a. Beneficiaries as Clients

William F. Fratcher, IIA *Scott on Trusts* § 173 (4th ed.1987), declares that a "beneficiary is entitled to inspect opinions of counsel procured by the trustee to guide him in the administration of the trust." This proposition is supported by two English cases, *Talbot v. Marshfield,* 12 L.T.R. 761 (Ch. 1865), and *Mason v. Cattley,* 22 Ch.D. 609 (1883). *See* Rust E. Reid, William R. Mureiko, & D'Ana H. Hikeska, *Privilege and Confidentiality Issues When a Lawyer Represents a Fiduciary,* 30 Real Property, Probate and Trust Journal 541, 561 (1996).

*Riggs National Bank of Washington, D.C. v. Zimmer,* 355 A.2d 709 (Del.Ch.1976), is the leading American case addressing the non-applicability of the privilege to trust beneficiaries. In *Riggs,* the beneficiaries of a trust sought to compel production of a legal memorandum prepared by an attorney named Workman. Workman's legal fees were paid from the corpus of the trust estate. The trustee refused to produce the document and claimed it was protected under the attorney-client and work product privileges. The document was prepared "in anticipation of potential tax litigation on behalf of the trust with the State of Delaware[.]" 355 A.2d at 710. However, the case before the court was an unrelated surcharge claim initiated by the beneficiaries.

The *Riggs* court concluded: "the trustee's invocation of the privileges cannot shield the document involved herein from the beneficiaries' desire to examine it." 355 A.2d at 712. The court explained:

> The trustee has been described as a mere representative whose function is to attend to the disposition and maintenance of the trust property so that it may be enjoyed by the beneficiaries in the manner provided by the settlor. In order for the beneficiaries to hold the trustee to the proper standards of care and honesty and procure for themselves the benefits to which they are entitled, their knowledge of the affairs and mechanics of the trust management is crucial. See *Bogert on Trusts*, 2d Ed., s 961. And, when the beneficiaries desire to inspect opinions of counsel for which they have paid out of trust funds effectively belonging to them, the duty of the trustees to allow them to examine those opinions becomes even more compelling. The distinction has often been drawn between legal advice procured at the trustee's Own expense and for his Own protection and the situation where the trust itself is assessed for obtaining opinions of counsel where interests of the beneficiaries are presently at stake. See *Restatement of Trusts*, 2d, s 173 comment b.

355 A.2d at 712.

*Barnett Banks Trust Co., N.A. v. Compson*, 629 So.2d 849 (Fla.Dist.Ct.App.1993), presents a scenario in which a trust beneficiary may not obtain materials prepared for the trustee. In *Barnett*, Mr. Compson created a revocable trust with a testamentary distribution of 90% to his wife, Mrs. Compson, and 10% to his brother. Barnett Bank was named trustee. Shortly after creating the trust, Mr. Compson "changed his directive ... by requesting that half of the assets be transferred to Mrs. Compson individually." *Id.* at 850. Barnett Bank, as trustee, filed an action to determine whether the later transfer was invalid under the terms of the trust agreement. Mrs. Compson counterclaimed, alleging breach of fiduciary duty and negligence. Thus, in essence, by opposing Barnett Bank's position, Mrs. Compson was asserting her rights to receive assets as an individual rather than as a beneficiary of the trust.

Mrs. Compson, relying on *Riggs,* requested all correspondence between the trustee and counsel. The court found *Riggs* did not require disclosure under the facts presented. The court distinguished *Riggs* as follows:

> The *Riggs* court's analysis hinges on a finding that the beneficiaries were the real clients of the trustee's attorney. Here, the real client is not Mrs. Compson. The opinions and strategy relating to the litigation were provided to the trustee to enable it to regain the assets of the trust and thereby diligently administer the trust to benefit the beneficiaries. Although Mrs. Compson may be a beneficiary of the trust, her position in this suit is antagonistic to the aligned beneficiaries and to her status as a beneficiary of the trust. Mrs. Compson does not stand to benefit from the trustee's actions in this suit. Thus, under the *Riggs* analysis, she is not the real client of the trustee's attorneys.

*Barnett,* 629 So.2d at 851.

The *Talbot* case offers a paradigmatic example as it involves one document which the beneficiaries were entitled to discover and one document which was subject to the attorney-client privilege. As the authors of *Privilege and Confidentiality Issues* explain:

> In Talbot the trustee obtained an opinion of counsel that a certain advance to some of the beneficiaries was permitted under the trust instrument. Funds from the trust estate were used to pay counsel for this opinion. After the trustee was sued in connection with the advance, the trustee obtained another opinion of counsel concerning the proper course to take in litigation. The second opinion was obtained with the trustee's own funds. The court ruled that the beneficiaries of the trust could discover the first opinion because it was obtained with trust estate funds and denied discovery of the second opinion because it was obtained with the trustee's own funds. Although the court never called the beneficiaries "clients" of the trustee's counsel, this seems to be the clear implication of the court's reasoning.

*Privilege and Confidentiality Issues* at 560–61 (footnotes omitted).

█ We find the *Riggs* rationale persuasive. In the instant case, the contested letters pertain to the administration

of the trust, not litigation between the parties. Furthermore, attorney Curry was apparently compensated from the corpus of the trust. Although the record is not clear as to the source of Curry's compensation, Laurens wrote him a letter asking that he "keep a separate accounting of the fees generated by the estate—one for the estate and one for Trust A (the QTIP trust that owns the house Anne H. Floyd occupies). Trust A's expenses should be borne by the trust and not by the beneficiaries of the estate." Under these facts, we hold that the attorney-client privilege does not bar Anne, as beneficiary of Trust A, from access to the Curry letters which were generated prior to litigation, and which address the administration of Trust A.

### b. Waiver of Attorney–Client Privilege

Even if the attorney-client privilege were to apply, it was waived when Laurens produced the letters in discovery. The attorney-client privilege excludes from evidence confidential communications of a professional nature between attorney and client, unless the client, for whose benefit the rule is established, waives the privilege. *Drayton v. Industrial Life & Health Ins. Co.,* 205 S.C. 98, 31 S.E.2d 148 (1944). *State v. Doster,* 276 S.C. 647, 284 S.E.2d 218 (1981), edifies:

> The attorney-client privilege has long been recognized in this State. The privilege is based upon a public policy that the best interest of society is served by promoting a relationship between the attorney and the client whereby utmost confidence in the continuing secrecy of all confidential disclosures made by the client within the relationship is maintained. The privilege belongs to the client and, unless waived by him, survives even his death. *South Carolina State Highway Department v. Booker,* 260 S.C. 245, 195 S.E.2d 615 (1973). Generally, the party asserting the privilege must raise it. *State v. Love,* [275] S.C. [55], 271 S.E.2d 110 (1980).

> Many jurisdictions strictly construe the privilege. 81 Am.Jur.2d Witnesses § 174, at 210. The reasoning behind the strict construction is that evidence excluded under the privilege is not necessarily incompetent. *See generally, McCormick, Handbook of the Law of Evidence,* §§ 87, et seq. (2d Ed.1972).

We agree that the privilege must be tailored to protect only confidences disclosed within the relationship.

*Doster* at 650–51, 284 S.E.2d at 219–20.

The United States Supreme Court, in *Upjohn Co. v. United States*, 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981), observed:

The attorney-client privilege is the oldest of the privileges for confidential communications known to the common law. Its purpose is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice. The privilege recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer's being fully informed by the client.... The lawyer-client privilege rests on the need for the advocate and counselor to know all that relates to the client's reasons for seeking representation if the professional mission is to be carried out.

*Upjohn* at 389, 101 S.Ct. 677 (internal quotation marks and citations omitted).

In order to protect a communication on the ground of attorney-client privilege, it must appear that the attorney was acting, at the time, as a legal advisor. *Marshall v. Marshall*, 282 S.C. 534, 539, 320 S.E.2d 44, 47 (Ct.App.1984) (citing *Branden & Nethers v. Gowing*, 7 Rich. 459 (S.C.App. 1854)). Only confidential communications are protected by the attorney-client privilege. *Cloniger v. Cloniger*, 261 S.C. 603, 193 S.E.2d 647 (1973). In *Ross v. Medical University of South Carolina*, 317 S.C. 377, 453 S.E.2d 880 (1994), the South Carolina Supreme Court stated:

Attorney-client privilege protects a client and any other person from disclosing confidential communications made to counsel relative to a legal matter. *See generally* McCormick on Evidence § 87 (E. Cleary, 3rd Ed.1984). However, this privilege is not absolute:

Not every communication within the attorney and client relationship is privileged. The public policy protecting confidential communications must be balanced against the public interest in the proper administration of justice. This is exemplified by the widely recognized rule that the

privilege does not extend to communications in further-ance of criminal tortious or fraudulent conduct.

*State v. Doster,* 276 S.C. 647, 651, 284 S.E.2d 218, 220 (1981) (internal citations omitted).

*Ross* at 383–84, 453 S.E.2d at 884–85.

The privilege may extend to agents of the attor-ney. For example, in *State v. Hitopoulus,* 279 S.C. 549, 309 S.E.2d 747 (1983), our supreme court held the attorney-client privilege extended to communications between a client and a psychiatrist retained to aid in the preparation of the client's case. As articulated in *State v. Thompson,* 329 S.C. 72, 495 S.E.2d 437 (1998):

[I]n determining whether the attorney-client privilege ex-tends to communications between a client and a non-lawyer, [a court] must balance two factors: (1) the need of the attorney for the assistance of the non-lawyer to effectively represent his client, and (2) the increased potential for inaccuracy in the search for truth as the trier of fact is deprived of valuable witnesses. However, before reaching this test, a court must ascertain whether the communication is confidential in nature.

*Thompson,* 329 S.C. at 75, 495 S.E.2d at 438–39.

The attorney-client privilege is owned by the client and, therefore, can be waived by the client. *South Carolina State Highway Dep't v. Booker,* 260 S.C. 245, 254, 195 S.E.2d 615, 620 (1973). "Any voluntary disclosure by a client to a third party waives the attorney-client privilege not only as to the specific communication disclosed, but also to all communi-cations between the same attorney and the same client on the same subject." *Marshall v. Marshall,* 282 S.C. 534, 538, 320 S.E.2d 44, 46–47 (Ct.App.1984) (citing *Duplan Corp. v. Deer-ing Milliken, Inc.,* 397 F.Supp. 1146 (D.S.C.1975); *U.S. v. Jones,* 696 F.2d 1069 (4th Cir.1982)).

In *Marshall,* Mrs. Marshall inadvertently left a letter addressed to her from her attorney in Mr. Marshall's pickup truck. The parties were separated at the time. Mrs. Marshall's attorney had been sending copies of his correspon-dence with Mrs. Marshall to her father, who was the surety for payment of Mrs. Marshall's attorney's fees. On appeal,

Mr. Marshall argued the letters from Mrs. Marshall's attorney were admissible because the attorney-client privilege had been waived. We held that Mrs. Marshall did not waive the privilege by mistakenly leaving one of the letters in Mr. Marshall's truck. However, we found "[t]he copies of correspondence sent by Mrs. Marshall's attorney to her father" presented "a different question." *Marshall* at 538, 320 S.E.2d at 47.

> In order to establish the attorney-client privilege, it must be shown that the relationship between the parties was that of attorney and client and that the communications were of a confidential nature. *State v. Love*, 275 S.C. 55, 271 S.E.2d 110 (1980). The communication involved must relate to a fact of which the attorney was informed by his client without the presence of strangers for the purpose of securing primarily either an opinion on law or legal services or assistance in some legal proceeding. *SEC v. Kingsley*, 510 F.Supp. 561 (D.C.D.C.1981); *In Re Grand Jury Proceedings*, 517 F.2d 666 (5th Cir.1975). The attorney-client privilege also applies to communications originating from the lawyer rather than from the client. When the attorney communicates to the client, the privilege applies only if communication is based on confidential information provided by the client. *Brinton v. Department of State*, 636 F.2d 600 (C.A.D.C.1980). The attorney-client privilege, though, does not protect communications with non-clients. *State v. Love, supra.*

*Marshall* at 538–39, 320 S.E.2d at 47.

We found that Mrs. Marshall's father was not a client of her attorney. By sending copies of the letters to the father, Mrs. Marshall's attorney was informing a third party of the current state of his client's lawsuit. However, we found that the letter Mr. Marshall sought to admit was not relevant. Therefore, the trial court was affirmed.

The record indicates Laurens produced the letters he now asserts are protected by the attorney-client privilege. Thus, assuming these letters were subject to the attorney-client privilege, Laurens waived that privilege by producing the letters.

### c. Open–Door Doctrine

Finally, Anne argues that Laurens opened the door to admission of the letters by his assertions at trial that he was following the advice of counsel in administering the trust.

This Court recently undertook a comprehensive review of the door-opening doctrine in the criminal law context. *See State v. Young,* 364 S.C. 476, 613 S.E.2d 386 (Ct.App. 2005). The doctrine applies in the civil context as well. *See, e.g., Martin v. Jennings,* 52 S.C. 371, 29 S.E. 807 (1898); *Central of Georgia Ry. v. Walker Truck Contractors,* 270 S.C. 533, 243 S.E.2d 923 (1978); *Benton Rhodes, Inc. v. Boden,* 310 S.C. 400, 426 S.E.2d 823 (Ct.App.1993); *see also Brooks v. Kay,* 339 S.C. 479, 486, 530 S.E.2d 120, 124 (2000) ("The Dead Man's Statute will not exclude . . . testimony where the party asserting the statute 'opens the door' by offering testimony otherwise excludible[.]").

One author has stated:

The primary purpose for the rule is that of fairness and completeness of the information for making the decision. If a party chooses to forego the protection of a rule by introducing evidence the opposing party would not be permitted to go into, then it is unfair not to allow the opposing party to go into the matter and provide more information to the fact-finder.

Danny R. Collins, *South Carolina Evidence* 2.9 (2d ed.2000).

At trial, Laurens repeatedly professed that he relied on the advice of various attorneys in formulating his position regarding the expenses of Trust A. Curry was not specifically named. However, Laurens made several general attestations that he was following the advice of counsel. For example, he averred his position was based on "what counsel had told us," and declared: "[t]hat's the way we were so instructed by counsel." By these assertions, he opened the door to the admission of the letters written by Curry in which Curry informed Laurens: "Eventually, you will have to pay the taxes[,]" and "You certainly will want to get the insurance paid as you have an obligation to protect the property." The letters suggest that—despite Laurens' claims to the contrary—he was not following the advice of counsel.

### III. Removal as Trustee

Laurens argues the trial judge erred in removing him as trustee of Floyd Sr.'s charitable remainder trust. We disagree.

The court, in its interim order, stated that Laurens had "advised the Court that he was considering resigning as trustee of the Charitable Remainder Trust[.]" Therefore, the court ordered that he either voluntarily resign by January 31, 2003, or else provide Anne with an accounting for the trust. Laurens did neither. The court found Laurens had committed serious breaches of trust that strongly supported his removal as trustee from any trust affecting Anne. Accordingly, the court removed Laurens as trustee of the charitable remainder trust.

### A. Standard of Review

"Trusts have long and broadly been a field for the jurisdiction of equity." *Epworth Orphanage v. Long,* 199 S.C. 385, 389, 19 S.E.2d 481, 482 (1942). On appeal from an action in equity, tried by a judge alone, this Court has jurisdiction to find facts in accordance with our view of the preponderance of the evidence. *Townes Assocs., Ltd. v. City of Greenville,* 266 S.C. 81, 221 S.E.2d 773 (1976); *Ingram v. Kasey's Assocs.,* 340 S.C. 98, 531 S.E.2d 287 (2000). However, we are not required to disregard the findings of the trial judge who saw and heard the witnesses and was in a better position to judge their credibility. *Ingram* at 105, 531 S.E.2d at 291.

The removal of a trustee is within the trial court's discretion and will not be reversed absent an abuse of that discretion. *Thinn v. Parks,* 79 Ark.App. 20, 83 S.W.3d 430, 433–34 (2002) ("The removal of a trustee is in the sound discretion of the trial court; its decision will not be overturned unless there is an abuse of that discretion."); *Ivey v. Ivey,* 266 Ga. 143, 465 S.E.2d 434, 437 (1996) ("In the absence of an abuse of discretion, a trial court's order regarding removal of a trustee will not be reversed."); *Matter of Estate of Atwood,* 577 N.W.2d 60, 63 (Iowa App.1998) ("The trial court has broad discretion in deciding whether to remove an executor or trustee."); *Ward v. NationsBank of Virginia, N.A.,* 256 Va. 427, 507 S.E.2d 616, 623 (1998) ("Removal of a trustee is

within the discretion of the trial court. The trial court must determine whether it is in the best interest of the trust for the trustee to be removed."); *Matter of Estate of Cooper*, 81 Wash.App. 79, 913 P.2d 393, 401 (1996) ("A court has a 'wide latitude of discretion' to remove the trustee, 'when there is sufficient reason to do so to protect the best interests of the trust and its beneficiaries.' ") (citing *Schildberg v. Schildberg*, 461 N.W.2d 186, 191 (Iowa 1990)); Restatement (Second) of Trusts § 107, comment a on clause (a) ("A court may remove a trustee if his continuing to act as trustee would be detrimental to the interests of the beneficiary. The matter is one for the exercise of a reasonable discretion by the court.").

## B. Law/Analysis

■ In *Wallace v. Foster*, 15 S.C. 214 (1881), our supreme court proclaimed:

There is no doubt but that a Court of Equity has full power, under proper proceedings, to remove trustees of all kinds, whether appointed by deed, will or order of court, upon good cause shown and when the exigency requires; and to substitute another instead of the one removed, and to invest him with title to and control over the trust estate.

*Id.* at 217. Although the Court of Equity has been abolished, The abolition of separate courts of law and equity by the South Carolina Constitution has not deprived the court of equity of its jurisdiction over trusts, *i.e.*, treated as a matter to be tried on [the] equity side of the court, without a jury, and subject to the rules as to appellate review.

*Price v. Brown*, 4 S.C. 144 (1973), quoted in Coleman Karesh, *Trusts* 38 (1977).

■ "The enforcement and administration of trusts has long been peculiarly within the jurisdiction of courts of equity which are jealous of the rights of *cestuis que trustent* [those for whose benefit the trust was created—i.e. the beneficiaries]." *Weston v. Weston*, 210 S.C. 1, 11, 41 S.E.2d 372, 376 (1947) (citation omitted). "[A] court of equity has the inherent power to exercise jurisdiction over the trust estates, to supervise their administration, and to make all orders necessary for their preservation and conservation[.]" *Williams v. Duncan ex rel. Pauline M. Babcock, Living Trust*, 55 S.W.3d 896

(Mo.App.2001) (internal quotation marks and citation omitted); *see also First Alabama Bank of Montgomery, N.A. v. Martin,* 425 So.2d 415, 423 (Ala.1982) ("Supervising the administration of trusts is a well-recognized ground of equity, . . . and the regulation and enforcement of trusts is one of the original and inherent powers of the equity court."). "[T]he probate court has exclusive jurisdiction of proceedings initiated by interested parties concerning the internal affairs of trusts. . . . These include, but are not limited to, proceedings to: (1) appoint or remove a trustee[.]" S.C.Code Ann. § 62–7–201 (Supp.2004).

■■■ Luculently, in South Carolina, a court may remove a trustee pursuant to its equity power. However, the case law of this State has not outlined when this power should be exercised.

"The court will remove a trustee if he has committed a sufficiently serious breach of trust or if it is probable that he will commit such a breach of trust or where for any other reason his continuance as trustee is likely to be detrimental to the interest of the beneficiary." Restatement (Second) of Trusts § 199, comment e.

According to *Scott on Trusts,* a trustee will be removed

if his conduct is such as to show his unfitness to administer the trust. Such unfitness may be clearly shown by evidence of dishonesty. He may be removed for serious breaches of trust even though the breaches of trust were not committed dishonestly. The mere fact, however, that the trustee has committed breaches of trust is not necessarily a ground for his removal. The trustee may be removed as a disciplinary measure, where he refuses or neglects to obey orders of the court.

The question has not infrequently arisen whether the beneficiaries can force the removal of the trustee on account of friction or hostility between him and them. The mere fact that there is such friction or hostility is not necessarily a sufficient ground for removal, since otherwise the beneficiaries could by quarreling with the trustee force him out.

. . . .

On the other hand, where there is such friction or hostility as seriously to impede the proper performance of the

trust, especially if the trustee is at fault, the trustee will be removed.

William F. Fratcher, 2 *Scott on Trusts* § 107 (4th ed.1987) (footnotes omitted). Although "[t]he court is less ready to remove a trustee who was named by the settlor ... [,][i]f the ground for removal did not exist at the time the settlor named the trustee or it was not know to the settlor, the court will not hesitate to remove him." 2 *Scott on Trusts* § 107.1. Bogert, in *The Law of Trusts and Trustees* § 519 (Rev.2d ed.), observes: "When in the course of the administration of a trust it becomes apparent that the trustee can not, in fairness to the beneficiaries, be allowed to continue in the exercise of his powers, he may be removed."

Other jurisdictions have found a trustee may be judicially removed for neglect to perform duties, breach of trust, failure to comply with a court order, and hostility between the trustee and beneficiaries. For example, in *Ackley v. Loughlin*, 406 So.2d 832 (Ala.1981), the settlor's widow filed an action to have her stepdaughter removed as trustee. The widow was an income beneficiary of the trust, and the settlor's daughter was the remainder beneficiary. The trial court removed the settlors daughter as trustee for, among other reasons, "hostility between the parties, delays in furnishing of money to the widow, and a controversy concerning [the daughter's] unauthorized use of some of the assets of the estate." *Id.* at 833. The Alabama Supreme Court affirmed, finding "an abundance of evidence of such hostility as justified the removal of Mrs. Ackley. Among other things, she quite evidently treated her stepmother very high-handedly and arbitrarily." *Id.*

In *Hargraves v. Hargraves*, 14 Ark.App. 230, 686 S.W.2d 816 (1985), the Arkansas Court of Appeals reviewed a trial courts removal of the settlors son as trustee. The son's mother was a beneficiary of the trust. "The trial court removed the trustee partly on the basis of the hostility and animosity which the trustee held for his mother, the principal beneficiary under the trust." *Id.* at 818. On appeal, the court noted: "The decision was soundly bottomed in fact and law." *Id.*

The Supreme Court of California, in *In re Gilmaker's Estate*, 57 Cal.2d 627, 21 Cal.Rptr. 585, 371 P.2d 321 (1962),

reversed the trial court's refusal to remove a trustee where the court found adequate grounds for removal. Among other reasons, the trustee refused to provide an accounting. The court noted that "[h]ostility between the beneficiary and the trustee is a ground for removal of the trustee when the hostility impairs the proper administration of the trust." *Id.* at 324 (citations omitted).

*Matter of Malone's Estate*, 42 Colo.App. 353, 597 P.2d 1049 (1979), affirmed the probate court's removal of the respondent as co-trustee of three separate trusts. The court observed:

> Proper grounds for removal include the existence of hostility and friction between the trustee and the beneficiaries, or between the trustee and his co-trustees, causing interference with the proper administration of the trust. Also, where ill-feeling between the trustee and the beneficiaries or between the trustee and his co-trustees reaches such a level that future cooperation and proper administration become improbable, the trustee may be removed even if misconduct is not proven. The court's paramount regard must be for the interest of the trust and the rights of the beneficiaries.

*Id.* at 1050 (citations omitted). The Colorado Court of Appeals found no abuse of discretion in the probate court's determination that the best interests of the beneficiaries would be served by removal of the respondent as co-trustee.

The Indiana Appellate Court reversed the probate court for failure to remove a trustee. *Helm v. Odle*, 129 Ind.App. 478, 157 N.E.2d 584 (1959). The appellate court found

> a serious failure by the appellee administratrix to handle and conduct the trust reposed in her with the 'scrupulous integrity' required of such trustees. It is our opinion that such breach of her trust by said appellee rendered her unsuitable and disqualified from further exercise of said trust.

*Id.* at 585–86.

In *Wilson v. Wilson*, 145 Mass. 490, 14 N.E. 521 (1888), the Supreme Judicial Court of Massachusetts decreed: "As to the removal of trustees without misconduct attributable to hostility, courts will remove them whenever it is essential to the due

exercise of the trust, even when they have been guilty of no misconduct and wish to remain." *Id.* at 522.

In *Maydwell v. Maydwell,* 135 Tenn. 1, 185 S.W. 712 (1916), the daughter of the testator and income beneficiary of a trust sought to have her mother removed as trustee. The court had no doubts about the "honesty or acumen" of the mother and found she had managed the estate well. However, the evidence showed the relationship between the mother and daughter was such that "it would be inadvisable and prejudicial to the best interests of both and of the estate for [the mother] to be continued as trustee." *Id.* at 713. Thus, the Tennessee Supreme Court reversed the lower court's decision to leave the mother as trustee.

The Wisconsin Supreme Court, in *In re Hill's Estate,* 272 Wis. 197, 75 N.W.2d 582 (1956), acknowledged: "The failure or refusal of a trustee to obey lawful orders of the court with respect to the trust is ground for his removal." *Id.* at 592 (citations omitted).

 In consonance with the foregoing, we hold that a trustee may be removed: (1) where the trustee is found unfit because of (a) dishonesty, (b) serious breaches of trust, or (c) failure to adequately perform trustee duties; (2) for refusal to obey orders of a court directed to the trustee in his role as trustee; and (3) where hostility between the trustee and the beneficiaries impedes the proper administration of the trust— especially where the trustee is at fault. The question of removal is directed to the sound discretion of the presiding judge. The appellate tribunals may find facts in accordance with their own view of the preponderance of the evidence.

 In the instant case, we find multiple grounds for removing Laurens as trustee of the charitable remainder trust. First, Laurens ignored the trial court's order by failing to provide Anne with an accounting of the trust. The trial judge did not err in removing Laurens for his contempt.

Second, we find no abuse of discretion in the court's finding that Laurens' actions "strongly support his removal as trustee from any trust affecting Wife." The trial judge found Laurens acted in bad faith and breached his fiduciary duty owed to Anne by (1) failing to pay expenses of Trust A, (2) failing to

make timely distributions of Trust A income to Anne, (3) failing to provide an accounting of the charitable remainder trust to Anne, (4) misstating the terms of Trust A, (5) managing Trust A property solely for the benefit of the remainder beneficiaries, (6) failing to follow the advice of counsel as to his duties as a trustee, and (7) failing to follow orders of the court.

Laurens argues there is no evidence he has mishandled his duties as trustee of the charitable remainder trust, and therefore, the trial court erred in removing him simply because of his conduct with respect to Trust A. He cites *Crayton v. Fowler*, 140 S.C. 517, 139 S.E. 161 (1927), in support of his position. In *Crayton*, the trustee improperly invested trust funds in a note and mortgage in violation of the directions contained in the trust document. *Id.* at 518, 139 S.E. at 161. Although the court found the trustee liable for the resulting loss on the investment, it determined because the trustee's actions were performed in good faith, they were not grounds for removal. *Id.* at 521, 139 S.E. at 162. Laurens asserts that in *Crayton* even negligence did not support removal; and since he has done no wrong in administering the charitable remainder trust, there is no support for removal here.

Initially, we reject Laurens' claims of innocence as to the charitable remainder trust. He neglected to provide Anne with an accounting and violated a court order. Indeed, in *Crayton*, the trustee's negligence did not require his removal, but the court did order him to enter a $7,500 bond. The court "further ordered that if [the trustee] fails to execute and file the bond above required within the time mentioned, or fails to do or perform any of the other matters and things required of him in this decree, then and in such event the said [trustee] is hereby removed as trustee of said trust estate[.]" *Crayton*, 140 S.C. at 521, 139 S.E. at 162. Thus *Crayton* firmly supports the removal of a trustee who violates a court order related to the trust.

Furthermore, were we to find Laurens innocent of wrongdoing as to the charitable remainder trust, which we do not, we reject his argument that wrongdoing as trustee of Trust A has no bearing on the question of his removal as trustee of another trust where the trusts share a beneficiary. Laurens' misconduct as trustee of Trust A is relevant to whether he should

continue as trustee of the charitable remainder trust where the trusts share a common beneficiary. Because Laurens has demonstrated his inability to honor his fiduciary duties and properly administer Trust A, we find no abuse of discretion in the trial court's conclusion that Laurens is unfit to be trusted with the administration of the charitable remainder trust of which Anne is likewise a beneficiary. Accordingly, we affirm the trial court's removal of Laurens as trustee of the charitable remainder trust.

## *CONCLUSION*

Because Laurens did not appeal the trial judge's order finding him in contempt of court, we find this decision to be the law of the case. Regardless, the contempt finding was a proper exercise of the court's discretion. We affirm award of fees as a combination of sanctions and damages. Further, we find no abuse of discretion in the trial judge's decision to admit into evidence letters written by Dial and Curry. The letters are not hearsay, and they are not protected by the attorney-client privilege. Finally, the trial judge did not err in his decision to remove Laurens as trustee of the charitable remainder trust. Accordingly, the trial judge's order is

**AFFIRMED.**

BEATTY and SHORT, JJ., concur.